# Supreme Court of Texas

No. 21-0676

Steve Huynh, Individually; Yvonne Huynh, Individually; Huynh
Poultry Farm, LLC d/b/a Steve Thi Huynh Poultry Farm d/b/a
Huynh Poultry Farm; T & N Poultry Farm, LLC; Thinh Bao
Nguyen, Individually; Timmy Huynh Poultry Farm; Timmy
Huynh, Individually; and Sanderson Farms, Inc.,

*Petitioners*,

v.

Frank Blanchard, Angelia Snow, Tanya Berry, Kimberly Riley,
John Miller, Amy Miller, Chad Martinez, Emily Martinez,
Mersini Blanchard, Malakoff Properties, LLC, and Ronny Snow,

*Respondents*

On Petition for Review from the
Court of Appeals for the Twelfth District of Texas

**Argued October 2, 2023**

JUSTICE BUSBY delivered the opinion of the Court, in which
Justice Lehrmann, Justice Boyd, Justice Devine, Justice Blacklock, and
Justice Young joined.

JUSTICE HUDDLE filed an opinion concurring in the judgment, in
which Chief Justice Hecht and Justice Bland joined, and in which
Justice Young joined as to Part I.

This is a nuisance suit brought by neighbors of two poultry farms located on a single tract of rural land in Henderson County, southeast of Dallas. A jury found that odors from the farms are a temporary nuisance, which is unchallenged here, and the trial court granted permanent injunctive relief that effectively shuts down the farms.

The farm owners and operators challenge the injunction on appeal, raising three issues: (1) whether the trial court abused its discretion in finding imminent harm; (2) whether equitable relief was unavailable because damages provide an adequate remedy; and (3) whether the scope of the injunction is overly broad. Although we reject the first two challenges and thus uphold the trial court's authority to grant an injunction, we conclude the trial court abused its discretion in crafting the scope of that injunction, which is broader than necessary to abate the nuisance. We therefore reverse in part and remand for the trial court to modify the scope of injunctive relief.

## BACKGROUND

Petitioner Sanderson Farms, Inc. is a poultry producer that partners with local farmers and growers—such as fellow petitioners Steve Huynh, Yvonne Huynh, Timmy Huynh, Thinh Bao Nguyen, Huynh Poultry Farm, LLC, and T & N Poultry Farm, LLC (collectively, "the Growers,"[1] and, together with Sanderson, "Defendants")—to raise broiler chickens destined for store shelves and family tables. Although Sanderson owns the chicks taken to the farms to grow into chickens, the

---

[1] This opinion uses "the Huynhs" to refer to one or more of the individual Growers and refers to the entities they operate as "the Huynhs' LLCs" or "the LLCs."

2

Growers own and largely operate the farms at issue, which are near Malakoff, Texas.

Respondents are eight owners of land near the farms (the "Neighbors") who sued Defendants for nuisance in May 2017. According to the Neighbors, the sources of the odors never stopped operating, fetid odors were persistent, and the risk of those odors suddenly appearing destroyed their ability to plan and enjoy outdoor activities, forcing them inside their homes.[2] Several of the Neighbors testified in detail about how the horrible odors made them physically ill, spoiled family activities, and destroyed their use and enjoyment of their properties. By the time of trial, the Neighbors had recorded hundreds of odor events on their properties in odor logs, and the Texas Commission on Environmental Quality ("TCEQ") had separately documented odor conditions as well as hundreds of complaints from residents in the area, including the Neighbors.

The facts in the record are important to our review of the trial court's determination of imminent harm, which was necessary for an injunction to issue in the first place, as well as our review of that court's balancing of the equities for and against enjoining Defendants' continued operations. We accordingly recount the facts in some detail in the light most favorable to the jury's verdict and the discretionary aspects of the trial court's rulings.

---

[2] The Neighbors alleged that the "putrid odor, loud noise, and flies emanating from [the Growers'] property are conditions that substantially interfere with the use and enjoyment" of their properties.

3

## A. Defendants' business arrangements

Under its Broiler Growing Program, Sanderson partners with local growers who raise Sanderson's chicks until they are ready to be collected and sold. Sanderson must approve the property where its growers operate, and its contracts are contingent on the growers meeting certain requirements, including timely constructing the chicken barns and obtaining TCEQ approval of certain permits and documents needed to operate the farms.

Sanderson became interested in having more poultry farms close to one of its existing processing facilities in Palestine, Texas.[3] It decided to locate the new farms in Henderson County, where some surrounding properties are likewise used for agriculture and other husbandry operations, though at a smaller scale.

Steve Huynh has owned and operated chicken barns in partnership with Sanderson since 2002. Sanderson's representatives met Steve at a proposed Henderson County site in May 2015 and, with Sanderson's approval, Steve purchased 230 acres in his name as sole owner. Steve then leased about half of the property to his son, Timmy Huynh, and about half to his cousin, Thinh Nguyen.

In 2016, Sanderson signed fifteen-year Broiler Production Agreements with Huynh Poultry, LLC, with Timmy as guarantor, and T & N Poultry, LLC, with Thinh as guarantor. Steve and his wife Yvonne Huynh own seventy-five percent of both Huynh Poultry and

---

[3] Sanderson also owns complexes—each consisting of a hatchery, processing plant, and feed mill—in Waco, College Station, and Tyler. Each complex is served by approximately 500 chicken barns.

4

T & N Poultry, while Timmy owns twenty-five percent of Huynh Poultry and Thinh owns twenty-five percent of T & N Poultry. Each LLC's agreement with Sanderson contemplated the construction and operation of a farm consisting of eight chicken barns on each leased parcel, for a total of sixteen adjacent barns at the same address. Although Timmy and Thinh had little to no experience raising chickens, Sanderson approved them as growers on the proposed farms, with the understanding that Steve and Yvonne would be the ones running the day-to-day operations of the farms.

## B.    The Growers' misrepresentations

The record shows that the Growers' efforts to establish and fund their large poultry operations included several misrepresentations, which allowed them to evade state and federal regulatory requirements that would normally help protect neighboring property owners from the nuisance conditions at issue.

*First*, before commencing operations, the Growers had to obtain approval from two state agencies—the Texas State Soil and Water Conservation Board and the TCEQ—to locate and operate the two farms on the property.[4] The Water Code charges the agencies with

---

[4] In Texas, "[a]ll poultry facilities producing poultry for commercial purposes are required to develop and implement a certified water quality management plan covering the poultry operating unit," which must be submitted to the Board for certification. 31 TEX. ADMIN. CODE § 523.3(j)(1); *see also* TEX. WATER CODE § 26.302. A poultry facility must also obtain an "air quality authorization" from the TCEQ. TEX. HEALTH & SAFETY CODE § 382.068(c); *see* 30 TEX. ADMIN. CODE §§ 321.43(a), 106.161(7). Both the applicable regulations and Sanderson's policies required the water quality

5

establishing factors "to determine whether a persistent nuisance odor condition is likely to occur when assessing the siting and construction of new poultry facilities." TEX. WATER CODE § 26.302(b-2). The agencies' regulations identify six "[f]actors that are considered likely to create a persistent nuisance odor," 31 TEX. ADMIN. CODE § 523.3(j)(3)(A), any one of which precludes the Board from certifying a water quality management plan "unless the facility provides an odor control plan the [TCEQ] determines is sufficient to control odors." *Id.* § 523.3(j)(3).

Each LLC began this approval process by submitting its own "Poultry Site Assessment Initial Questionnaire,"[5] which required the Growers to answer, among other questions, whether there are "any neighbors currently within one quarter of one mile of the facility," whether there are "any neighbors between one quarter and one half of one mile in the prevailing wind direction of the facility," and whether "the facility [will] house more than 225,000 birds." The term "neighbor" includes not only nearby residences, but also "other poultry farm[s] under separate ownership." *Id.* Because each question addresses one of the factors that the Board and the TCEQ have determined by rule are "likely to create a persistent nuisance odor and will require the proposed facility to submit an odor control plan," *id.* § 523.3(j)(3)(A), the instructions for the questionnaires point out that "[i]f the answer to any

---

management plan to be in place before placing any birds on the property. *See* 31 TEX. ADMIN. CODE § 523.3(j)(1).

[5] Although Timmy and Thinh were listed on the contracts with Sanderson, Steve Huynh filled out the questionnaire for his adult son Timmy and signed his son's name.

of [the questions] is yes, the facility is likely to cause a persistent nuisance odor" and additional requirements need to be met.

Although the Growers accurately indicated that each facility would house more than 225,000 total birds, the trial court found in issuing its injunction that the Growers' questionnaire responses also contained misrepresentations—a finding Defendants do not challenge in this Court. Evidence showed that these misrepresentations included: (1) indicating there were no neighbors within one-quarter mile of the proposed facility; (2) indicating there were no neighbors between one-quarter and one-half mile downwind of the proposed facility; and (3) representing that the property contained two separate farms, each controlled by different LLCs, even though the farms would be located immediately adjacent to each other and constituted a single operation. *See id.* § 523.3(b)(7)(A), (j)(1).

According to the governing regulations, accurate answers would have required either that "the facility provides an odor control plan the [TCEQ] determines is sufficient to control odors," or that "each neighbor within one half of one mile of the proposed facility provides a consent form properly signed by the neighbor or authorized legal representative(s) of the neighbor," which the facility must include in the water quality management plan submitted to the Board. *Id.* § 523.3(j)(3), (j)(3)(A), (j)(3)(D). Neither requirement was met.

Specifically, the Growers did not obtain their neighbors' consent. The Growers did submit initial Odor Control Plans to the TCEQ for each of the two farms in August 2015, though they were not involved in their

preparation.[6] Among other things, the plans addressed at a high level management of litter (chicken manure mixed with pine shavings), management of mortality (*i.e.*, storage and disposal of dead chickens), catch-out/clean-out procedures, and litter storage. But these initial plans were predicated on and perpetuated the Growers' misrepresentations. They did not attach maps showing the two farms adjacent on the same property and within one-quarter mile of residential neighbors, as the TCEQ's sample plan requires,[7] nor is there any indication that the TCEQ otherwise knew those facts so it could take them into account in determining whether the plans were sufficient to control odors. Moreover, the record does not reflect any determination

---

[6] Sanderson gave the plans to Steve Huynh to submit to the TCEQ. No witness recalled either Timmy or Thinh—the designated growers—having received a copy of the odor plans, including Timmy and Thinh themselves, although they were the only individuals who had contractual or regulatory responsibility to ensure implementation of the plans. For example, Timmy testified that he could not remember if anyone had ever given him a copy of the initial Odor Control Plan prior to his deposition. A division manager for Sanderson's Tyler Production Division likewise testified that she assumed the Growers received a copy from the other LLC members given that Steve and Yvonne were at the farm to which it was mailed.

[7] Aside from inserting the date, owner name, farm name, and county name, the Growers' initial Odor Control Plans are verbatim copies of the sample Odor Control Plan published on the Board's website. *Odor Control Plan* (2022), TEXAS STATE SOIL AND WATER CONSERVATION BOARD, https://tsswcb.texas.gov/sites/default/files/2022-03/odor_control_plan_final.pdf (last visited May 17, 2024). The Growers did not even remove directory information that the TCEQ included in the sample plan simply for the applicant's own information.

by the TCEQ (informal or otherwise) that these initial plans were, in fact, sufficient to control odors.[8]

In sum, this initial permitting framework requires that "[p]oultry facilities must request development and certification or recertification of a water quality management plan prior to placing poultry at a new facility." *Id.* § 523.3(j)(1).[9] Had the Growers provided full and accurate information as part of their initial applications, they would not have been able to begin raising chickens at any scale until the TCEQ was satisfied that the farms would be implementing sufficient odor-control practices. *Id.* § 523.3(j)(3).

Over two years later, after the Neighbors complained of odors and the TCEQ issued notices of violation ("NOVs"), the TCEQ required the Growers to meet with its staff to design and implement a Strategic Odor Control Plan for each farm. In contrast to the permitting phase, this

---

[8] The Board has published a sample water quality management plan, which includes a sample letter from the TCEQ confirming that it received an Odor Control Plan for the poultry facility and stating that the letter serves as notice that the plan has been reviewed and approved by the TCEQ. Letter from TCEQ to John Foster, 72 (Apr. 17, 2015), https://www.tsswcb. texas.gov/sites/default/files/files/programs/poultry-water-quality-management -program/example_poultry_wqmp.pdf. The Board also supplies forms for certifying water quality management plans, which require execution by the Board as well as the local Soil and Water Conservation District. *See Water Quality Management Plan*, TEX. STATE SOIL & WATER CONSERVATION BD., https://www.tsswcb.texas.gov/programs/water-quality-management-plan (last visited May 15, 2024). No such letters or certifications are included in our record.

[9] *See also* 31 TEX. ADMIN. CODE § 523.3(h)(4)-(5) (providing that the Board shall "conduct status reviews of plan implementation" and "may withdraw certification of a water quality management plan that is not being implemented in accordance with its schedule").

process does not limit the farms' ability to continue operations while contesting any violations—as Defendants did to the fullest possible extent—and negotiating with the TCEQ regarding additional practices required to constrain odors. As explained below, the process was ultimately unsuccessful.

***Second***, the trial court made an unchallenged finding that the Growers misrepresented who was controlling and operating the farms to obtain operating subsidies from the federal government.[10] These subsidies helped the Growers build and operate larger odor-producing facilities.

Evidence at trial showed that Timmy Huynh received up to $161,754 in subsidies over three years, as well as $40,836 in reimbursements for actions he claimed were taken to reduce chicken manure odors. Thinh Nguyen received $181,161 in subsidies from the same federal program. But the subsidy checks were mailed to Steve

---

[10] Timmy and Thinh were each listed as the participant in a United States Department of Agriculture ("USDA") Conservation Program Contract, which provides government subsidies for certain poultry operations. Although Steve and Yvonne owned seventy-five percent of each LLC, directly owned and controlled the land, directed the operations of the farms, and handled all of the farms' finances, Steve did not disclose his involvement as required and admitted that he did not list his own name on the subsidy forms because he would not have qualified for the subsidies, as his income exceeded the $900,000 eligibility limit. *Cf.* 7 C.F.R. §§ 1400.10(a), 1400.105 (requiring disclosure of indirect ownership interests); *id.* § 1400.500(a) (income limits for direct and indirect recipients of subsidies).

Huynh's address, and they were deposited in the LLCs' bank accounts without Timmy's or Thinh's involvement.[11]

### C. Defendants' operations and typical growing cycle

Defendants ultimately developed two farms on 230 acres of land surrounded by dense woods. Steve Huynh testified that he took out roughly four million dollars in loans to construct the facilities and commence operations, with each chicken barn costing about $300,000 to build. Defendants designed each barn to contain 27,600 square feet of floor space in which the chickens could move freely over pine shavings.

Although Sanderson's policy was to limit each grower to eight barns on a contract, the Growers set up eight barns on each of the two farms on the property. Each farm was owned by one of the Huynhs' LLCs, but they were located only 300 feet apart on Steve Huynh's property and both were run almost entirely by Steve and Yvonne with the assistance of two employees and occasional help from Thinh.

Sanderson placed its first flock of chickens in eight barns in June 2016 and picked up that flock in August 2016. By November 2016, all sixteen barns were in operation. The Growers housed 27,800 chicks in each barn at a time for a total capacity of 444,800 birds per flock across all sixteen barns—twice the number considered "likely to cause a persistent nuisance odor" by the TCEQ.

---

[11] The trial court also made unchallenged findings that certain Defendants "failed to report or under-reported taxable income." But because the Neighbors have not addressed how this failure contributed to the nuisance found by the jury, we do not consider it in evaluating whether the balance of the equities supports the scope of the trial court's injunction. *See infra* Part III.

In each cycle, Sanderson hatches a flock of chicks and delivers them to the Growers' barns. The Growers care for and feed the chicks over roughly sixty days as they grow into fully mature chickens. Because the dry litter (manure mixed with pine shavings) in the barns is never removed while the barns are occupied, the chickens' manure continues to accumulate in the barn throughout the growing cycle, and the volume of manure produced per day increases as the chickens grow. The manure either stays in the chicken barns or is used to help decompose dead chickens at the property's composting site.

At the end of the growing cycle, it takes roughly sixty Sanderson employees two days to catch the chickens, which are transported to Sanderson's Palestine plant for processing. The barns are then emptied and partially cleaned—the Growers "decak[e]" the solid waste, using a big machine to remove fifteen to twenty tons of solid waste per house per clean out, while the remainder of the litter is put in piles called "windrows" and reused during the next growing cycle. Sanderson only requires its growers to clean the barns completely once every five years.

Sanderson pays its growers on a per-pound basis for the live chickens that remain in the flock for processing at the end of each growing cycle. Sanderson does not separately compensate its growers for clearing the manure or dead birds that result from raising a flock of chickens.

Five people were responsible for operating all sixteen of the Growers' barns. Their duties included picking up and composting an average of 367 dead chickens per day. At 4.7 flocks per year, the Growers were housing 2,090,560 birds at the sixteen barns each year and

intended to grow over thirty-one million chickens in those barns during their fifteen-year contracts with Sanderson.

## D. Odor complaints and TCEQ involvement

There was detailed testimony at trial regarding the odors caused by the accumulation, cleaning, storage, and processing of the chicken manure deposited during each growing cycle, as well as the composting of dead chickens. For example, the two farms produced over nine million pounds of chicken manure per year, an estimated 175 tons of ammonia, and an unspecified amount of hydrogen sulfide. With an average mortality rate of around five percent per flock, each growing cycle also resulted in the on-site composting of roughly 22,000 dead birds, for a total of about 88,960 dead birds (444,800 pounds) per year.

### 1. The chicken farms' effect on neighboring properties

The court and jury also heard extensive testimony regarding the extent to which the Growers' neighbors could smell the chicken farms. The property's closest neighbors, Don and Charlyne Hughes, lived east and upwind of the chicken farms. Charlyne testified that she never heard or smelled the chickens, but her husband testified at a pretrial hearing that he had. Although the Hugheses lived closest to the farms, Sanderson's division manager, Randall Boehme, admitted that the area generally had a south to southwest wind and that the neighbors who had complained and sued live downwind of the Growers' chicken farms.

Several of the Neighbors—who acquired their property long before the farms were built—testified regarding the existence, frequency, and severity of the odors that the chicken farms produced.

13

*Tanya Berry*: According to Tanya Berry, the chicken-farm odor was so "pungent" that she had to cover her nose and sometimes it made her gag. Although she and her daughter used to ride horses on the property "all the time," they stopped because her daughter found the smell so offensive that she insisted on hauling their horses to other locations for their rides. Their family also stopped eating on the porch outside and her daughters could no longer get their friends to visit.

*Frank and Mersini Blanchard*: Frank Blanchard owns about 1,200 acres with four houses, and his mother Mersini lives in one. Mersini testified that she used to spend every morning walking the property and appreciating the smell of the country, but the chicken barns emitted an odor that smelled like "[s]our feet with chemicals, chicken poop and dead animals all together." The smell had made her sick to her stomach on several occasions, made her gag whenever it got in her throat, and caused her to see her grandchildren only when she visited them in another town because they did not want to endure the smell at her house. The smell also caused the Blanchards to move their annual Christmas party for sixty to seventy people. Frank testified that he and his guests "tried several options to get away from the odors," but odors would sometimes "engulf[] the whole property."

*Ronny and Angelia Snow*: Ronny Snow testified the farms' odors had three distinct smells: the death smell, the ammonia or chemical smell, and the chicken manure smell. His wife Angelia testified that as soon as she opens her house or garage door, she is hit with "a putrid, death, rotten, manure smell" and sometimes has to cover her nose and run to the house or car. Angelia also testified that the odor sometimes

makes her sick, including her nose burning or even vomiting. Although the Snows tried contacting the TCEQ, Angelia testified that the odor and their calls often occurred after TCEQ had closed for the day, which would result in hours-long delays before the investigator would arrive—with the wind sometimes changing direction in the interim.

The Snows testified that the odors caused their family to stop outdoor activities like birthday parties and horseback riding. They abandoned a planned swimming pool and outdoor kitchen as "unrealistic" given the odors and "let [their] roping pen go back to grass because they never knew when the smell would be so bad [Ronny's sons] wouldn't be able to practice." According to Angelia, "[y]ou stay inside so you don't have to smell it outside, and then it comes in the house" such that "[y]ou can't get away from it."

*Emily Martinez*: The Martinezes built their home in 2009 and "were outside all the time" until the chicken farms arrived. Since then, "most of the[ir] [outdoor] time . . . gets cut short because of the smell," which Emily likened to a dead animal. Like the Blanchards, Emily testified that she used to have dozens of people over on weekends and holidays. But her family had to stop gathering or hosting birthday parties on the property once the chicken barns began operating.

*John Miller*: John Miller owns roughly fifty acres near the chicken farms. According to John, he experienced "several different types of smells" from the chicken farms, including one "where it smelled like death, kind of a putrid, makes you sick to your stomach smell," as well as a chemical smell that "kind of burn[s] your nose when you smell it." Sometimes he would smell the odors a couple days in a row and

15

other times it might skip a few days before the smell returned, but it was usually "a little bit worse" and "more frequent" toward the end of the growing cycle. Although John also called the TCEQ, he likewise experienced hours-long delays between complaint and investigation. In addition to a ruined birthday party for his daughter, John testified that, in general, his family missed out on "memories" in terms of inviting people over and "you can't get those back." The family moved all events and recreation inside or to other locations.

*Kim Riley*: Kim Riley testified that she owns and lives on two acres near the chicken farms in Malakoff, property that has been in her family "since the late 1800s." She and her family used to "love being outdoors and spending time outside," but they "don't want to be outdoors at all" on the property anymore because the chicken farms caused "a repeated smell" of varying duration. Kim testified that they "had just expanded the entire outdoor area around [their] pool and added a fire pit and a lot of landscaping" when the odors started, and that she found it "very sad to think that [they] would have to limit any activities to just inside the home." According to Kim, her family has been too "embarrass[ed] to have anyone to [their] home because . . . it smells like you have a dead animal waiting for you at the front door."

### 2. The Neighbors' complaints to Sanderson

The Neighbors began calling Sanderson to complain about the smell from the Growers' chicken barns as early as October 2016—two months after Sanderson delivered a flock of chickens to the first eight barns and one month before all sixteen barns became operational. Frank Blanchard called various Sanderson phone numbers in January

16

2017 and ultimately reached Boehme, who Frank learned was the person "to complain to about any barns in the Palestine area." Although Frank was surprised to learn that chickens "develop [in their] own manure for 60, 70 days at a time," Boehme informed him that "this is just part of living next to a chicken farm" and they would inevitably "smell odors."

Boehme explained the periodic nature of the odor's strength and informed him that the smell would be worst during the two days at the end of the growing cycle when Sanderson picked up the broiler chickens because the chickens flap their wings, kicking up dust particles, and the normally closed barn doors are kept open. Although there would be "a couple weeks of relief" in between growing cycles, Boehme recommended that Frank and his family should stay indoors for the last two days of the growing cycle for their health and safety. Frank Blanchard testified that Boehme "fully understood that the chicken farms put out offensive odors and that . . . it's just the way it was going to be." Boehme also told Frank that "there was no way they could prevent the odors from coming onto [the Blanchards'] property" because "the farms were too big" and "[t]here were too many birds."

### 3. The Neighbors' complaints to the TCEQ and odor logs

The TCEQ began receiving complaints from neighbors about the farms' odor in August 2016, near the end of the growing cycle for the first flock. In the year that followed, the TCEQ documented thirty-seven additional complaints from neighbors about the chicken odors, as well

17

as one complaint that the number of rodents increased when the farms' property was cleared.

Following the TCEQ's instructions, some of the Neighbors began keeping odor logs—some of which include several monthly entries recording "putrid" or "rotting chicken" smells—and submitting them to the TCEQ. For example, in early 2017, the Neighbors' odor logs reflect complaints about odors on seven days in January, eight days in February, and thirteen days in March. A TCEQ official estimated that the Neighbors' logs documented hundreds of odor complaints from 2016 to 2019. At trial, the Neighbors' expert, Dr. Heber, testified that he cross-referenced data from the Corsicana weather station with the Neighbors' odor logs and identified a correlation between their complaints about smell and "whether the wind was actually blowing toward those receptors" at the times indicated in the logs.

### 4. TCEQ investigations and resulting notices of violation to the Growers

The Neighbors' complaints prompted the TCEQ to send investigators to the area on dozens of occasions, which resulted in the TCEQ issuing three NOVs[12] to the Growers in late 2016 and early 2017. A TCEQ investigator first documented nuisance odors on October 18,

---

[12] The TCEQ's former Chairman explained that an NOV "serves as a notice . . . [of] an allegation that a violation may have occurred" and is intended to "bring . . . the regulated entity to the table to develop a plan to ensure . . . they're taking proper actions to minimize the risk of a nuisance condition occurring." The next potential step would be to issue an NOE, or Notice of Enforcement, "whereby they would notify the respondent that the [TCEQ] is looking to take enforcement action," which "would likely lead to a penalty potentially as well as corrective action which can be a number of things."

2016, and determined the Growers' chicken houses were the source of the odors, and the TCEQ issued the first NOV in December. The TCEQ issued a second NOV on February 17, 2017, though it concerned burning of unauthorized materials rather than nuisance odors. The Growers received the third NOV on March 27, 2017, after a TCEQ investigator conducted a Frequency, Intensity, Duration and Offensiveness ("FIDO") odor survey the previous month—three days after the second NOV issued—that documented a nuisance condition due to chicken-waste odor. A TCEQ investigator conducted another FIDO survey in June 2017 and again detected a chicken waste odor classified as offensive for over one hour.

Because the TCEQ was unable to determine whether one or both farms caused the odor, it issued the three NOVs to both Huynh Poultry and T & N Poultry. And although Sanderson admitted in an internal memo that the sixteen barns "really need to be considered as one unit," Defendants contested the NOVs in part by having each of the nearly identical farms on the property contend that the other was to blame for the smell.[13]

### 5. Defendants' failure to comply with TCEQ requirements

As a result of the third NOV, the TCEQ required each farm to enter into a comprehensive compliance agreement called a Strategic

---

[13] For example, an August 2017 response to the TCEQ states that "I understand the same TCEQ investigation resulted in the issuance of an NOV to a dry litter poultry farm which is located adjacent to my farm," but "[i]t appears that no effort was undertaken to identify which of these two poultry farms was the actual source of the alleged odors."

Odor Control Plan.[14]   After the TCEQ and Sanderson representatives met to discuss the violations, Sanderson submitted Strategic Odor Control Plans for the Growers' farms to the TCEQ on October 31, 2017. In addition to the requirements of the initial Odor Control Plans,[15] these Strategic Odor Control Plans committed the Growers to (1) add fresh shavings on top of the litter with every flock, (2) put up additional fly bait stations, and (3) "deep clean" the chicken houses at least once for every two flocks raised.  The Strategic Odor Control Plans also required Sanderson to send a service tech to monitor litter conditions at least twice per week, rather than the usual once per week.[16]

As with the initial Odor Control Plans, however, the record does not reflect a determination by the TCEQ that these Strategic Odor Control Plans were, in fact, sufficient to control odors.  Although one expert witness testified without elaboration or personal knowledge that the plans were "approved," TCEQ official Michelle Baetz testified that although each plan addressed parts of the TCEQ's request, "the strategic odor control plan . . . was not received in the manner that [the TCEQ] asked for" and Defendants' responses did not meet the level of

---

[14] *See* TEX. HEALTH & SAFETY CODE § 382.068(d) ("The commission by rule or order shall require the owner or operator of a poultry facility for which the commission has issued three notices of violation under this section during a 12-month period to enter into a comprehensive compliance agreement . . . that the executive director determines is sufficient to control odors.").

[15] *See supra* Part B.

[16] Although the email to the TCEQ copied multiple Sanderson lawyers, the Huynnhs themselves were not copied on the submission.  Instead, one of Sanderson's employees reported hand-delivering a copy to Steve in October 2017.

detail she was expecting, such as "what was being done at the farms . . . as a corrective measure." For example, the plans did not indicate the frequency of complete clean-outs, which the Neighbors' expert, Dr. Heber, testified "has an impact on the emissions" based on data from scientific studies available for broiler chickens, which "show that hydrogen sulfide, for example, increased from one flock to the next until it got . . . cleaned out." And although Sanderson agreed to audit the Growers' sixteen barns, it never provided the TCEQ with sufficient results from that audit.[17]

Baetz also testified that the TCEQ had not "been able to get compliance and therefore [had not] been able to resolve the violations." She questioned whether the corrective measures that the Strategic Odor Control Plans did describe were ever actually implemented, as the TCEQ continued to receive complaints from neighbors about the smell at the same rate. The TCEQ issued two additional NOVs on October 18, 2018, and October 7, 2019, for a total of at least five NOVs by the time of trial.[18]

According to another TCEQ official, Fred Lacy, "just about every single time [he] went" to investigate a neighbor's complaint, he detected odors "characteristic of a poultry-style facility." Lacy testified that a greater number of NOVs might have been issued but for the automatic

---

[17] A Sanderson employee emailed Baetz notes in October 2017 regarding the employee's visits to the Malakoff farms during the week of August 21-24, 2017. But Baetz testified that the audit addressed only parts of the request and contained insufficient detail.

[18] The TCEQ's former Chairman testified that the farms received a total of six NOVs during his tenure.

grace period that attaches to an NOV, precluding additional NOVs for ninety days as well as the duration of any contest to the NOV.

### 6.     Defendants continue their operations

All three Sanderson employees who testified at trial disputed the NOVs and denied that there was a smell or that any detectable odor was offensive, and two of them further asserted that the Growers were following best practices for the industry. All four of the Growers who testified at trial likewise denied that an offensive odor was present, denied that they had failed to implement the measures from the Strategic Odor Control Plans, and disclaimed any knowing irregularities in their initial permitting application or their application for USDA subsidies.

The record shows that despite the well-documented history of neighbor complaints, TCEQ violations, and the pending nuisance suit, Sanderson never reduced the number of chickens delivered to the Growers' farms and continued to deliver the same number every growing cycle. The employee in charge of nationwide production testified that Sanderson has sufficient excess capacity in East Texas that it would not have to sign any new contracts to rehouse the chicks currently being delivered to the Growers. But Boehme testified that Sanderson never analyzed whether the Growers' contracts should be terminated given the number of complaints and violations they received.

### E.     Procedural history

When the odors failed to dissipate, the Neighbors sued Defendants on May 31, 2017, roughly a year after the farms began

operating. The Neighbors' fourth amended petition alleged nuisance, nuisance *per se*, and other common-law claims, and sought millions of dollars in damages for lost property value as well as a permanent injunction shutting down the entire poultry operation.

### 1. Temporary injunction proceedings

Defendants hired Norman Mullin, the owner of an agricultural engineering firm that designs Concentrated Animal Feeding Operations ("CAFOs"), in preparation for a temporary injunction hearing. Although the trial court did not issue a temporary injunction, it considered evidence from that hearing as well as the trial in issuing its permanent injunction.

Mullin testified at the hearing that he and his team conducted odor readings around the Huynhs' property from May 2017 through May 2018.[19] They collected and recorded 1,466 off-site readings on forty-four days in a variety of weather and wind conditions.[20] Of those readings, 1,300 samples were recorded as unable to detect an odor, and 136 of the readings detected an odor of chicken manure.

---

[19] They took readings at four locations, including (1) a spot near one of the chicken farms, (2) an intersection across from the Blanchard property, (3) a spot on the county road between the Blanchard property and the Snow property, and (4) a spot near the Martinez property.

[20] The readings were taken with a Nasal Ranger, an instrument that allows its user to control the ratio of contaminated to filtered air to determine the point at which an odor becomes detectable. In other words, the Nasal Ranger measures the amount of fresh air that must be added to negate the odor.

## 2.      Trial and jury verdict

The Neighbors ultimately tried their case to a Henderson County jury in October 2019.  At the charge conference, the parties disputed the extent to which the Neighbors might be entitled to both damages and injunctive relief, as well as the nature of any nuisance injury and whether the distinction between permanent and temporary nuisance was a question of law or fact.  Although the trial court had denied Defendants' motion for directed verdict, it agreed to submit a separate question that would ask the jury, if they found a nuisance, whether that nuisance was temporary or permanent.

The first three questions in the court's charge asked the jurors about the existence of a private nuisance and whether such nuisance was caused by any of the Defendants.  In response, the jury found that all Defendants both "intentionally" and "proximately cause[d] a private nuisance," defined as "a condition that substantially interferes with the use and enjoyment of Plaintiffs' property by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it."  In other words, the jury necessarily rejected the Growers' chief argument, which was that none of the smells or other conditions caused by the Growers' operations had ever risen to the level of a nuisance.

Given these answers, the jury then proceeded to consider Question Four, which sought to address whether the nuisance they had found was temporary or permanent:

Is the injury –

24

1. of such a character as to recur repeatedly, continually, and regularly, such that future injury can be reasonably evaluated?

– or –

2. of such a character that any anticipated recurrence would be only occasional, irregular, intermittent, and not reasonably predictable, such that future injury could not be estimated with reasonable certainty?

The jury selected option 2 as to each defendant.[21]

The jurors were likewise conditionally instructed to answer Question Five if they found a nuisance. That question asked them to identify for each property the "difference in the market value in Henderson County, Texas, of Plaintiff's property with and without the alleged nuisance." The jury provided dollar amounts for each of the seven properties, ranging from $65,000 for Tanya Berry to $3,510,000 for Frank and Mersini Blanchard, for an aggregate total of $5,986,500 in lost market value.

### 3. Post-trial motions, injunction, and appeal

After trial, Defendants moved for a take-nothing judgment or a judgment notwithstanding the verdict while the Neighbors moved for a

---

[21] The court used a portion of the then-current language from the Texas Pattern Jury Charges, which has since been altered. *Compare* STATE BAR OF TEXAS, TEX. PATTERN JURY CHARGES: GENERAL NEGLIGENCE, INTENTIONAL PERSONAL TORTS & WORKERS' COMPENSATION 12.4 (2018), *with id.* (2022) (omitting reference to future injury, among other changes). We are not asked to approve either pattern charge, and we discuss what our precedent requires in Part I below. Although the Pattern Jury Charges also include a question regarding past damages for temporary nuisance, no party requested that this question be included in the court's charge.

permanent injunction. The parties ultimately agreed to a take-nothing judgment regarding the monetary damages that the jury found in answer to Question Five given the jury's answer to Question Four.

But the trial court determined that it had discretion to issue a permanent injunction given the jury's nuisance findings. Following a hearing, the court signed an amended final judgment that awarded the Neighbors no monetary damages but granted a permanent injunction against Defendants' operations. The trial court found that Defendants had violated section 101.4 of title 30 of the Texas Administrative Code and subsections 382.085(a)-(b) of the Texas Health and Safety Code, as documented by the TCEQ, and that Defendants had no plans to change their mode of operating or otherwise reduce the odor pollution going forward.

The trial court also concluded that the Neighbors lacked an adequate remedy at law because Defendants "are unwilling and unable to abate the odor pollution that emanates from the operation" of the chicken farms. Although the court considered alternative options short of shutting down the operation, it determined that any narrower injunction would be neither economic nor feasible, "nor would it be equitable . . . partly based on weighing the behavior and credibility of [the Growers] versus [the Neighbors]."

Defendants appealed.[22] The court of appeals affirmed, relying on cases holding that injunctions are permissible to prevent the recurrence

---

[22] The record indicates that the trial court required an appeal bond of over three million dollars, payable at $171,000 per month for eighteen months. No further bond information appears in our record.

26

of a nuisance or a multiplicity of suits. *See* 683 S.W.3d 30, 39 (Tex. App.—Tyler 2021). Defendants then filed a petition for review, which we granted.

## ANALYSIS

Before turning to the merits of Defendants' issues, we begin with some relevant background principles. "The law of 'nuisance' seeks to balance a property owner's right to use his property as he chooses in any lawful way against his duty not to use it in a way that injures another." *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 590-91 (Tex. 2016) (internal quotation marks omitted). "A 'nuisance' is a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it." *Holubec v. Brandenberger*, 111 S.W.3d 32, 37 (Tex. 2003) (*Holubec I*).

"This Court recognized early on that a nuisance could result from an array of actions by a wide variety of defendants, and could involve interference with numerous different interests through both physical substances and intangible conditions, such as water, stones, rubbish, filth, smoke, dust, odors, gases, noises, vibrations, and the like." *Crosstex*, 505 S.W.3d at 592 (footnote and internal quotation marks omitted). "There is no question that foul odors, dust, noise, and bright lights—if sufficiently extreme—may constitute a nuisance." *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 269 (Tex. 2004).

"It is well-settled that three different remedies are potentially available to a claimant who prevails on a private-nuisance claim: damages, injunctive relief, and self-help abatement. . . . However, not

27

all remedies are available in every case." *Crosstex*, 505 S.W.3d at 610 (citations omitted).[23] "Generally, when a nuisance is temporary, the landowner may recover only lost use and enjoyment . . . that has already accrued." *Id.* (internal quotation marks omitted).[24] Such backward-looking damages "are calculated as loss of rental value, . . . or use value, . . . or possibly the cost of restoring the land." *Id.* (citations omitted).[25] If a nuisance is permanent, the owner may recover lost market value—a figure that reflects all losses from the injury, including lost rents

---

[23] *See also* RESTATEMENT (THIRD) OF TORTS: REMEDIES § 43 (AM. L. INST., Tentative Draft No. 2, 2023).

[24] *See also Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Tex.), L.P.*, 449 S.W.3d 474, 481 (Tex. 2014) ("We maintain that the purpose of the law 'in every case, is to compensate the owner for the injury received, and the measure of damages which will accomplish this in a given case ought to be adopted.'" (quoting *Pac. Express Co. v. Lasker Real-Est. Ass'n*, 16 S.W. 792, 793 (Tex. 1891)).

[25] *Cf. Wales Trucking Co. v. Stallcup*, 474 S.W.2d 184, 186 (Tex. 1971) (noting jury finding that "the plaintiffs lost temporary use of their house"); *Town of Jacksonville v. McCracken*, 232 S.W. 294, 295 (Tex. Comm'n App. 1921, judgm't adopted) ("If the injury to the land is only temporary, and the nuisance also temporary and capable of being abated," then "the measure of damages to be applied is such depreciation in its rental value or use as had occurred up to the time of the trial of the action."); *Bowie Sewerage Co. v. Chandler*, 138 S.W.2d 585, 588 (Tex. Civ. App.—Fort Worth 1940, writ dism'd) ("The proper measure of damages in such cases . . . is the depreciation in the rental value, or use, or special damages to the land." (internal quotation marks omitted)); *Cross v. Tex. Mil. Coll.*, 65 S.W.2d 794, 795 (Tex. Civ. App.—Dallas 1933, writ dism'd) ("[T]he depreciation in rentals and such consequential personal inconvenience and hurt as may be the natural and direct proximate result arising from such a nuisance are the elements of damage recoverable, and not the depreciation in market value of such property.").

expected in the future." *Id.* at 610-11.[26] "[W]e apply [these] rule[s] with some flexibility, considering the circumstances of each case to ensure that an award of damages neither over- nor under-compensates a landowner for damages to his property." *Gilbert Wheeler, Inc. v. Enbridge Pipelines (E. Tex.), L.P.*, 449 S.W.3d 474, 481 (Tex. 2014).

In addition, when the necessary foundational findings have been made, "[a] court may decide to abate a nuisance whether it is temporary or permanent." *Crosstex*, 505 S.W.3d at 610; *see also Schneider*, 147 S.W.3d at 286-88. The forward-looking decision to grant or deny a permanent injunction "is ordinarily within the sound discretion of the trial [court], and [its] action will be reversed only when a clear abuse of that discretion is shown." *Repka v. Am. Nat'l Ins. Co.*, 186 S.W.2d 977, 981 (Tex. 1945); *see Operation Rescue–Nat'l v. Planned Parenthood of Houston & Se. Tex., Inc.*, 975 S.W.2d 546, 560 (Tex. 1998). In particular, although "a jury may have to settle" relevant factual disputes "about what happened," questions regarding "the expediency, necessity, or propriety of equitable relief" are for the trial court to decide, and its rulings are reviewed for abuse of discretion. *Wagner & Brown, Ltd. v.*

---

[26] *But see, e.g., Gilbert Wheeler*, 449 S.W.3d at 482 (noting an exception that applies "[i]n cases involving real property injured by the destruction of trees" such that "even when the proper measure of damages is the loss in the fair market value of the property to which the trees were attached, and the value of the land has not declined, we have held that the injured party may nevertheless recover for the trees' intrinsic value" and that the "exception was created to compensate landowners for the loss of the aesthetic and utilitarian value that trees confer on real property"); *see also id.* at 483 ("The intrinsic value of a tree lies in its ornamental (aesthetic) value and its utility (shade) value." (internal quotation marks omitted)).

*Sheppard*, 282 S.W.3d 419, 428-29 & nn. 53-54 (Tex. 2008).[27]  A trial court abuses its discretion by acting arbitrarily and unreasonably or misapplying the law to the established facts of the case.  *Triantaphyllis v. Gamble*, 93 S.W.3d 398, 402 (Tex. App.—Houston [14th Dist.] 2002, pet. denied) (citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985)).

"To be entitled to a permanent injunction, a party must prove (1) a wrongful act, (2) imminent harm, (3) an irreparable injury, and (4) the absence of an adequate remedy at law."  *Pike v. Tex. EMC Mgmt., LLC*, 610 S.W.3d 763, 792 (Tex. 2020).  For the reasons explained below, we reject Defendants' arguments that the second and fourth prerequisites for injunctive relief were not met in this case.  But because we agree that the trial court abused its discretion in crafting an injunction that is overly broad, we reverse the judgment in part and remand for narrowing consistent with Part IV of this opinion.

## I.  The jury's intermittent-nuisance finding did not preclude the trial court from finding imminent harm.

In light of the jury's answers and various undisputed facts, the trial court found not merely imminent but continuing harm from Defendants' ongoing operations.  Specifically, the court made the following findings in issuing its permanent injunction:

- "Defendants have operated and/or allowed to be operated, and intend to continue to allow to be operated, the Activities on Defendants' Properties in a manner that has caused and

---

[27] *See also Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002) (applying abuse-of-discretion standard of review); *Lee v. Downey*, 842 S.W.2d 646, 649 n.9 (Tex. 1992).

continues to cause, inter alia, odor pollution to intrude on, near, and/or over Plaintiffs' Properties so as to cause a substantial and unreasonable interference with the use and enjoyment of Plaintiffs' Properties and create a nuisance."

- "Defendants have not reduced the level of their Activities on Defendants' Properties since Defendants began operations and have no intention of doing so now or in the future.  On the contrary, Defendants admit that if an injunction does not issue, they will continue to conduct their Activities in the future in exactly the same way they have done in the past."

- "Defendants' Activities, if not enjoined, will continue in the future, rendering a judgment for money damages against one or more Defendants incomplete, ineffectual, and inadequate, such that Plaintiffs have no adequate remedy at law."

The Neighbors' testimony, their odor logs, and the TCEQ's issuance of multiple NOVs—including shortly before trial—support the jury's findings that the odors from the chicken barns constitute a nuisance.  Indeed, Defendants' own expert admitted at the temporary injunction hearing that his team detected chicken-manure odors at least 136 times over forty-four days.  Moreover, undisputed evidence supports the trial court's finding that this intermittent nuisance will continue indefinitely, including:  the TCEQ's additional observance of nuisance-level odors during the NOVs' probationary periods, Baetz's testimony that the TCEQ had not been able to obtain a satisfactory odor control plan or achieve compliance from the two farms, Defendants' continuing denials that any nuisance ever existed, Sanderson's decision to continue its partnership with the Growers, and the Growers' admissions that they will continue operating just as they have absent an injunction.

Defendants do not challenge any of these findings as unsupported by the evidence detailed above.  Rather, they argue the trial court was legally precluded from finding imminent harm—one of the prerequisites to injunctive relief—because, in their view, such a finding contradicts the jury's answer to Question Four of the charge.  Defendants characterize this answer as the jury's "temporary nuisance" finding: that the Neighbors' nuisance injury is "of such a character that any anticipated recurrence would be only occasional, irregular, intermittent, and not reasonably predictable, such that future injury could not be estimated with reasonable certainty."

We disagree with Defendants' characterization and underlying assumptions.  As explained below, whether a nuisance is temporary or permanent and whether harm is imminent are questions for a court, not a jury.  Importantly, disputed questions of fact may underlie both inquiries.  And when they do, we agree with our concurring colleagues that findings on these foundational questions must be "the building blocks upon which injunctive relief rests."  *Post* at 3-4 (Huddle, J., concurring in judgment).  But because the temporary-versus-permanent inquiry and the imminent harm inquiry ask different questions, findings underlying one often will not dictate the answer to the other.  That is the case here: the jury's finding that the unreasonable discomfort and annoyance is intermittent does not contradict the undisputed fact—conclusively established on this record—that it will continue in the same intermittent manner absent an injunction.  This latter fact satisfies the imminent harm prerequisite for injunctive relief.

Specifically, we discern two flaws in Defendants' position:

32

***First***, both the imminence of future harm and the question whether the nuisance at issue is temporary or permanent are matters of law or equitable discretion for a trial court—not a jury—to decide. We have recognized that "[a]lthough a litigant has the right to a trial by jury in an equitable action, only ultimate issues of fact are submitted for jury determination." *State v. Tex. Pet Foods, Inc.*, 591 S.W.2d 800, 803 (Tex. 1979). But "[t]he determination of whether to grant an injunction based upon the ultimate issues of fact found by the jury is for the trial court, exercising chancery powers, and not the jury." *Id.* at 803. "As a general rule, a jury 'does not determine the expediency, necessity, or propriety of equitable relief.'" *Burrow v. Arce*, 997 S.W.2d 229, 245 (Tex. 1999) (quoting *Tex. Pet Foods*, 591 S.W.2d at 803). "[F]actors like the adequacy of other remedies and the public interest . . . , as well as the weighing of all other relevant considerations, present legal policy issues well beyond the jury's province of judging credibility and resolving factual disputes." *Id.* Thus, "the weighing of all equitable considerations . . . and the ultimate decision of how much, if any, equitable relief should be awarded, must be determined by the trial court." *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 741 (Tex. 2018) (quoting *Hudson v. Cooper*, 162 S.W.3d 685, 688 (Tex. App.—Houston [14th Dist.] 2005, no pet.)).[28]

---

[28] *See In re Troy S. Poe Tr.*, 646 S.W.3d 771, 786 (Tex. 2022) (Busby, J., concurring) ("Although the line between an ultimate issue of fact and the ultimate decision of how much, if any, equitable relief should be awarded . . . may not always be bright, the inquiry is nonetheless a familiar one." (cleaned up)).

Applying these principles in the imminent harm context, we have concluded that "the question of whether imminent harm exists to warrant injunctive relief is a . . . question for the court" in "*all* cases," "not a factual question for the jury." *Operation Rescue*, 975 S.W.2d at 554 (emphasis added); *see also Tex. Pet Foods*, 591 S.W.2d at 803 ("We do not consider the question of likelihood of (defendant's) resumption or continuation of the acts enjoined as being an ultimate issue of fact for the jury." (quoting *Alamo Title Co. v. San Antonio Bar Ass'n*, 360 S.W.2d 814, 816 (Tex. Civ. App.—Waco 1962, writ ref'd n.r.e.)). As we have explained, "[w]hen the jury finds violations occurring and continuing up to or near the date of the trial, . . . [t]he probability of the continuation of the prohibited practices is not a matter which is susceptible of direct proof, and injunctive relief is proper when the trial court finds it justified under the rules of equity, notwithstanding a defendant's cessation of the activity or solemn promises to cease the activity." *Tex. Pet Foods*, 591 S.W.2d at 804. Thus, "[u]nlike the determination of whether a nuisance occurred, the decision to enjoin the defendant's conduct or use is a discretionary decision for the judge after the case has been tried and the jury discharged." *Crosstex*, 505 S.W.3d at 610 (internal quotation marks omitted).[29]

Similarly, we have held that "whether an injury [to property] is temporary or permanent is a question of law for the court to decide." *Gilbert Wheeler*, 449 S.W.3d at 481. Thus, a jury's finding that a

---

[29] So, for example, it would have been an abuse of discretion for the trial court to grant an injunction if the jury had *rejected* the claim that the Growers caused a nuisance. But the jury did find a nuisance here, which required the trial court to address the equitable matters within its authority.

nuisance is temporary does not necessarily preclude a court's finding of imminent harm. *See id.* at 484 (explaining "it would have been error for the trial court to include" question regarding whether injury to land "was temporary or permanent"); *cf. Schneider*, 147 S.W.3d at 283 ("Ordinarily it makes no difference whether the jury finds that the nuisance is permanent . . . .").

Our holdings that these overarching questions are for courts to decide should not be understood to suggest there is no role for juries to play in answering them. To the contrary, the jury's role is an essential one in many cases. We have recognized "that questions regarding the facts that *underlie* the temporary-versus-permanent distinction *must* be resolved by the jury upon proper request." *Gilbert Wheeler*, 449 S.W.3d at 481 (emphases added); *see also Schneider*, 147 S.W.3d at 281 ("Jurors must also settle any disputes as to whether similar conditions are reasonably certain to continue in the future.").[30] Likewise, when there are factual disputes about the conditions that inform whether imminent harm exists to support a permanent injunction, the jury's role may include, for example, finding whether "violations [are] occurring and continuing up to or near the date of the trial." *Tex. Pet Foods*, 591 S.W.2d at 804. But the disputed facts that underlie a particular disagreement regarding whether a nuisance is temporary or permanent are not necessarily the same facts that are relevant to the imminent harm inquiry, as we explain next.

---

[30] Thus, we do not hold "that the court can ignore jury findings that are relevant to this [temporary-versus-permanent] determination." *Post* at 4 n.1 (Huddle, J., concurring in judgment).

35

*Second*, Defendants are incorrect that temporary nuisance and imminent harm are inconsistent concepts. A condition that our cases have labeled a "temporary" nuisance can be likely to continue or recur in the future (and thus cause imminent harm supporting a forward-looking permanent injunction), yet not in such a frequent and predictable way that it affects the property's market value (and thus only certain past damages are presently recoverable).[31] As a result, factual findings that support characterizing a nuisance as temporary do not preclude a court from issuing a permanent injunction.[32]

Whether an injury to property is permanent or temporary is a distinct inquiry from—and assessed under a different standard than—whether imminent harm is likely. We have explained that these inquiries "involve different considerations by different decision-makers at different points in the litigation." *Schneider*, 147 S.W.3d at 286. The answers to these inquiries also serve different functions. The distinction between temporary and permanent nuisances determines matters such as when a claim accrues, what damages are available, and whether future suits may be required. *Id.* at 275. But "[a] trial judge's decision

---

[31] Courts cannot award both forward-looking injunctive relief and permanent nuisance damages (which include those expected to occur in the future), as doing so would create a double recovery. *Schneider*, 147 S.W.3d at 284; RESTATEMENT (THIRD) OF TORTS: REMEDIES § 45.

[32] *Crosstex*, 505 S.W.3d at 610; *Schneider*, 147 S.W.3d at 286-87; *see also post* at 5-6 (Huddle, J., concurring in judgment). For example, if a landowner advertises that it will host fantastically loud all-night parties on its property twelve times during a year, with each party to be announced twenty-four hours in advance, a trial court could enjoin future parties at the neighbors' behest if a jury finds the first few parties caused noise nuisances even though the parties are sporadic and it is not yet known when the next one will occur.

on abatement often turns on considerations never presented to the jury, and unrelated to the frequency or duration of the nuisance." *Id.* at 287. Given our conclusion that the "requirements for issuing an injunction are not the same as those that distinguish between nuisances," we have declined to "conflat[e] their disparate requirements." *Id.* at 287.

Because these distinct inquiries are not mutually exclusive, we have recognized that "[a] court may decide to abate a nuisance whether it is temporary *or* permanent." *Crosstex*, 505 S.W.3d at 610 (emphasis added); *see also Schneider*, 147 S.W.3d at 286-87. Indeed, even Defendants concede that a temporary nuisance sometimes poses imminent harm. Thus, they cannot be right that a temporary nuisance finding bars a trial court from finding imminent harm.

Texas cases that have fleshed out the temporary–permanent dichotomy and addressed the meaning of imminent harm confirm our conclusion that these inquiries are distinct and thus a temporary nuisance may be enjoined. With respect to the temporary–permanent inquiry, "for more than a century, Texas courts have defined temporary and permanent nuisances along lines that are somewhat closer to the plain meaning of the words." *Schneider*, 147 S.W.3d at 272. Given "the relative nature of the terms involved," the inquiry turns on questions such as "how long [the nuisance] lasts" (duration), "how often it occurs" (frequency), and the "extent of nuisance conditions" (severity)—factual matters that a jury must also consider in deciding whether the condition constitutes a nuisance at all. *Id.* at 273, 275; *see also id.* at 281.

We have recognized that "a nuisance *may* be considered temporary" (1) if "it is uncertain if any future injury will occur," (2) "if

37

future injury is liable to occur only at long intervals," (3) if the nuisance is "occasional, intermittent or recurrent, *or*" (4) if it is "sporadic and contingent upon some irregular force such as rain." *Id.* at 272 (emphasis added) (internal quotation marks omitted). Thus, a nuisance that is occasional, recurrent, or affected by irregular weather forces[33] in a manner that makes future damages difficult to quantify with reasonable certainty can be classified as temporary even though it is also imminent or likely to recur. *See id.* at 276-77, 280-81.

On the other hand, "a permanent nuisance may be established by showing that *either* the plaintiff's injuries *or* the defendant's operations are permanent." *Id.* at 283 (emphases added). For example, "construction of a source of foul odors is likely to lower the market value of neighboring property permanently, even if operations are occasionally discontinued for months at a time." *Id.* at 276 (internal quotation marks omitted).[34] One Texas court used this insight to reject a similar argument that a jury's finding of temporary nuisance from a poultry operation foreclosed an injunction, explaining that "if appellant saw fit to bring the [15,000] chickens back and continue the operation as he was doing at the time the city filed its suit [and the neighbors intervened],

---

[33] *Cf. Schneider*, 147 S.W.3d at 283 (recognizing that because "air and wind are more evenly distributed[,] air-quality complaints . . . may be worse under certain conditions, but no one would presume the wind will never change"; consequently, "a recurrent nuisance is a permanent one, even if it is difficult to predict what the weather will be on any particular day" (internal quotation marks omitted)).

[34] *See also Schneider*, 147 S.W.3d at 277 ("A permanent nuisance need not be eternal; [d]amage need not be perpetual in order to be permanent." (internal quotation marks omitted)).

the nuisance would reoccur." *Ellen v. City of Bryan*, 410 S.W.2d 463, 465 (Tex. Civ. App.—Waco 1966, writ ref'd n.r.e.).

Because Defendants' operations are indisputably permanent, the Neighbors could have argued for a presumption of permanent interference in the trial court and sought to focus any factual disputes on whether that presumption had been rebutted.[35] But they did not, nor do they ask that this nuisance be considered permanent as a matter of law.[36] The trial court did not address such issues either, and doing so is unnecessary to resolve this case. But as explained below, the trial court could properly consider the permanent nature of Defendants' operations in deciding whether there was conclusive evidence of imminent or continuing harm to support an injunction.

Turning to the imminent harm inquiry, Texas cases likewise indicate that the harm from either a temporary or a permanent nuisance

---

[35] "We define a permanent nuisance as one that involves 'an activity of such a character and existing under such circumstances that it will be presumed to continue indefinitely.'" *Schneider*, 147 S.W.3d at 272 (quoting *Bayouth v. Lion Oil Co.*, 671 S.W.2d 867, 868 (Tex. 1984)). But the presumption that "a permanent source will result in permanent interference" can be "rebutted by evidence that a defendant's noxious operations cause injury only under circumstances so rare that, even when they occur, it remains uncertain whether or to what degree they may ever occur again." *Id.* at 277, 283.

[36] For example, the Neighbors have not argued that they proved conclusively that the nuisance was permanent—a well-settled basis for disregarding a jury's contrary finding when the challenging party has the burden of proof. *E.g., Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *cf. post* at 5 (Huddle, J., concurring in judgment). We therefore express no view on that issue. Nor have they addressed how the jury's award of permanent-nuisance damages for lost market value in Question Five could be reconciled with the jury's answer to Question Four. Instead, the Neighbors agreed to a judgment that does not award such damages.

can satisfy this prerequisite for injunctive relief. If the nuisance is actual (as the jury found here), the imminent harm prerequisite is met when the injury is ongoing, whether in a continuous or recurrent manner; if the nuisance is threatened, the prerequisite is met when injury is imminent and will necessarily be sustained. *See Holubec v. Brandenberger*, 214 S.W.3d 650, 657 (Tex. App.—Austin 2006, no pet.) (*Holubec II*); *Freedman v. Briarcroft Prop. Owners, Inc.*, 776 S.W.2d 212, 216 (Tex. App.—Houston [14th Dist.] 1989, writ denied); *O'Daniel v. Libal*, 196 S.W.2d 211, 213 (Tex. Civ. App.—Waco 1946, no writ).

"[A]n injunction will not lie to prevent an alleged threatened act, the commission of which is speculative and the injury from which is purely conjectural." *Dallas Gen. Drivers, Warehousemen & Helpers v. Wamix, Inc., of Dallas*, 295 S.W.2d 873, 879 (Tex. 1956).[37] But a finding of imminent harm can follow from a variety of circumstances, including actual injury, a pattern of actions, a threat to undertake harmful action, and other non-speculative bases to conclude that harm is impending.[38] Thus, "showing that the defendant will engage in the activity sought

---

[37] *See also Tex. Dep't of Pub. Safety v. Salazar*, 304 S.W.3d 896, 908 (Tex. App.—Austin 2009, no pet.) ("Establishing probable, imminent, and irreparable injury requires proof of an actual threatened injury, as opposed to a speculative or purely conjectural one.").

[38] *See, e.g.*, *Vaughn v. Drennon*, 202 S.W.3d 308, 313 (Tex. App.—Tyler 2006, pet. denied) (explaining that finding of imminent harm can be based on "actual injury, the threat of imminent harm, or another's demonstrable intent to do that for which injunctive relief is sought"); *Bankler v. Vale*, 75 S.W.3d 29, 39 (Tex. App.—San Antonio 2001, no pet.) ("Demonstrable intent to breach a restrictive covenant will support an injunction . . . ."); *Harbor Perfusion, Inc. v. Floyd*, 45 S.W.3d 713, 716-17 (Tex. App.—Corpus Christi–Edinburg 2001, no pet.); *Tri-State Pipe & Equip., Inc. v. S. County Mut. Ins. Co.*, 8 S.W.3d 394, 401 (Tex. App.—Texarkana 1999, no pet.).

be enjoined" is sufficient to establish imminent harm for purposes of injunctive relief. *Schmidt v. Richardson*, 420 S.W.3d 442, 447 (Tex. App.—Dallas 2014, no pet.) (citing *State v. Morales*, 869 S.W.2d 941, 946 (Tex. 1994)). Likewise, "[w]hen the jury finds [past] violations occurring and continuing up to or near the date of the trial, the trial court may, in equity, determine that the defendant has engaged in a settled course of conduct and may assume that it will continue, absent clear proof to the contrary." *Tex. Pet Foods*, 591 S.W.2d at 804.

*Application.* In light of these legal principles, we hold that the factual component of the jury's finding in response to Question Four—that the odors were "occasional, irregular, [and] intermittent"[39]—does not contradict the court's determination of imminent harm based on undisputed evidence that the nuisance will intermittently continue in the same unremitting way absent an injunction. As detailed above, there was ample evidence of intermittently recurring odors from Defendants' farms up to the time of trial—which the jury found to be a nuisance—as well as undisputed evidence that similar conditions would continue to recur absent an injunction. This evidence supports the trial court's imminent harm determination regardless of whether the odors were "temporary" in the sense that it was difficult to assess their effect on neighboring property values with reasonable certainty. The

---

[39] We do not suggest that "the trial court could have disregarded the jury's answer to Question 4." *Post* at 4 (Huddle, J., concurring in judgment). Instead, we assume for purposes of our analysis that the trial court fully credited the factual portion of that answer. As discussed below, we need not address in this case how a court should treat a jury's answer to a question that incorrectly submits a combination of factual and legal matters for the jury to decide.

41

concurrence's analogy to a chronic disease is an apt one: "[i]ts symptoms may worsen at times and then subside, but the diagnosis remains." *Post* at 5-6 (Huddle, J., concurring in judgment).

We recognize that certain facts underlying the imminent harm inquiry may be disputed in some cases. For example, there may be a dispute about whether any nuisance injury found by the jury will be ongoing in either a continuous or recurrent manner, or about whether a threatened nuisance is imminent and will necessarily be sustained.

But there are no such disputed facts here. Defendants' principal position at trial was that their operations did not cause any nuisance at all. Defendants have not argued in any court or offered any evidence that a nuisance—if found by the jury—was atypical rather than the consequence of their normal operations, much less that the nuisance would cease. Nor have they ever contended that the jury's verdict could not support injunctive relief because it omitted a finding that the nuisance would recur, or that the trial court's findings were improper. Indeed, all agree that Defendants' operations are permanent, and the trial court correctly noted that Defendants "admit . . . they will continue to conduct their Activities in the future in exactly the same way they have done in the past." Under these circumstances, there was no disputed issue of fact to be resolved regarding whether the nuisance found by the jury would continue to recur in the same intermittent manner.[40] *See City of Keller v. Wilson*, 168 S.W.3d 802, 814-15 (Tex.

_____

[40] After finding a temporary nuisance, the jury awarded the Neighbors nearly six million dollars in damages for the lost market value of their properties. Although the parties agreed to set these awards aside, the

2005) ("[U]ncontroverted issues need not be submitted to a jury at all."); *Wright v. Vernon Compress Co.*, 296 S.W.2d 517, 523 (Tex. 1956) ("No jury finding is necessary to establish undisputed facts.").[41]

Nor does the jury's answer to Question Four amount to a finding that the nuisance would *not* recur intermittently. Question Four is about whether the nuisance is temporary or permanent; it does not submit any factual disputes underlying the imminent harm inquiry, which is distinct as previously explained. Furthermore, that question includes non-factual matters and is not tailored to submit the collection of facts in dispute that are relevant to the temporary-versus-permanent distinction.

Specifically, the jury found in response to Question Four that the nuisance was "of such a character that any anticipated recurrence would be only occasional, irregular, intermittent, and not reasonably predictable, such that future injury could not be estimated with reasonable certainty." That finding includes matters outside the jury's province. As we have explained, "jurors cannot decide questions such as whether damages can be estimated with reasonable certainty." *Gilbert Wheeler*, 449 S.W.3d at 480 (quoting *Schneider*, 147 S.W.3d at 281). Rather, "jurors should determine whether a nuisance works temporary or permanent injury *only to the extent* there is a dispute regarding what interference has occurred or *whether* it is likely to continue." *Id.* at 480-

_____

magnitude of the jury's awards certainly suggests that it took into account the undisputed evidence that the nuisance would recur.

[41] Thus, we need not explore when a finding on such a disputed issue should be made by a jury versus a judge. *Compare Schneider*, 147 S.W.3d at 281, *with Tex. Pet Foods*, 591 S.W.2d at 803-04.

43

81 (internal quotation marks omitted, emphases added) (quoting *Schneider*, 147 S.W.3d at 281).[42]  Here, the jury determined what interference had occurred when it found nuisance conditions in answer to earlier questions.

Question Four also submitted a collection of factual adjectives— "occasional, irregular, [and] intermittent"—to describe the nuisance. But those frequency-related adjectives only bear on one dimension of the temporary-versus-permanent distinction, and they were joined by "and" even though all need not be found.[43]  The jury was also instructed to consider those adjectives only to determine whether "future injury could not be estimated with reasonable certainty," which is outside the jury's province as just explained.

More importantly, even if Question Four were not deficient on its own terms, it does not submit any factual disputes that underlie the distinct inquiry into whether the actual yet intermittent nuisance found by the jury is *imminent*: that is, whether it is ongoing in either a continuous or recurring manner.[44]  Question Four asked about the

---

[42] *But cf. Tex. Pet Foods*, 591 S.W.2d at 804 ("The likelihood that violations would occur in the future would not have been a proper issue to submit to the jury; the question is for the trial court to decide as a court of equity.").

[43] "A nuisance is also temporary if it is occasional, intermittent *or* recurrent."  *Schneider Nat'l Carriers*, 147 S.W.3d at 272 (emphasis added) (internal quotation marks omitted).  On the other hand, a nuisance can be permanent "even if the exact dates, frequency, or extent of future damage remain unknown." *Id.* at 280.  In addition to frequency, the temporary-versus-permanent inquiry considers severity and duration. *See supra* at 36-37.

[44] *See supra* at 39.  In contrast, our prior nuisance cases contain examples of factual jury questions that could be tailored to inform a trial

frequency of "any anticipated recurrence," not about *whether* any nuisance found in response to earlier questions would recur.[45] Thus, assuming without deciding that it would be proper to extract and fully credit only the factual component of the jury's finding (that the nuisance is "occasional, irregular, [and] intermittent"), that finding does not contradict the undisputed fact that this intermittent nuisance will recur.

For these reasons, we disagree with Defendants that the jury's answer to Question Four legally foreclosed the trial court from determining that the intermittent nuisance found by the jury will cause ongoing harm. We therefore defer to the trial court's determination of imminent harm—which Defendants have not otherwise challenged— and turn to the question whether the Neighbors have an adequate, though unpursued, remedy at law in the form of past damages for temporary nuisance.

---

court's equitable discretion. *See, e.g., Nat. Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 152-53 (Tex. 2012) (noting jury findings that "the noise and odor from the station created a permanent nuisance, and . . . those conditions '*first created a nuisance*' on . . . the date of the TCEQ citation" (emphasis added)); *Holubec I*, 111 S.W.3d at 38 (charge asked jury whether "the conditions or circumstances complained of as constituting the basis for the nuisance action . . . remained substantially unchanged since" a particular date).

[45] Ordinarily, of course, a plaintiff's failure to obtain a finding on a disputed factual matter underlying the imminent harm inquiry would mean that it did not establish an essential component of the foundation necessary to support a permanent injunction (unless our precedent would support implying the finding). But in this case, as we have explained, undisputed evidence showed that the nuisance would continue to recur intermittently.

## II. The Neighbors lack an adequate remedy at law.

Defendants next challenge the trial court's determination that the Neighbors could obtain an injunction because "there is no adequate remedy at law to grant complete, final, and equal relief to [them]." In particular, the trial court found that Defendants' "activities, if not enjoined, will continue in the future, rendering a judgment for money damages against one or more Defendants incomplete, ineffectual, and inadequate, such that Plaintiffs have no adequate remedy at law." The court also found that "one or more Defendants cannot respond in money damages."

Defendants do not challenge the finding that some of them are incapable of responding in damages, which is one recognized ground for concluding that an available legal remedy is inadequate.[46] Instead, they

---

[46] *See, e.g.*, *Tex. Black Iron, Inc. v. Arawak Energy Int'l Ltd.*, 527 S.W.3d 579, 587 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("Texas cases hold that a plaintiff does not have an adequate remedy at law if the defendant faces insolvency or becoming judgment proof before trial."); *Loye v. Travelhost, Inc.*, 156 S.W.3d 615, 621 (Tex. App.—Dallas 2004, no pet.) ("No adequate remedy at law exists if damages are incapable of calculation or if a defendant is incapable of responding in damages. . . . A plaintiff does not have an adequate remedy at law if the defendant is insolvent."); *Blackthorne v. Bellush*, 61 S.W.3d 439, 444 (Tex. App.—San Antonio 2001, no pet.); *Tex. Indus. Gas v. Phx. Metallurgical Corp.*, 828 S.W.2d 529, 533 (Tex. App.—Houston [1st Dist.] 1992, no writ); *Goldome Credit Corp. v. Univ. Square Apts.*, 828 S.W.2d 505, 511 (Tex. App.—Amarillo 1992, no writ) ("[N]o adequate remedy at law exists if the defendant is incapable of responding in damages. . . . If [the defendant] does not exist, it can hardly respond in damages."); *Olhausen v. Thompson*, 704 S.W.2d 434, 437 (Tex. App.—Houston [14th Dist.] 1986, no writ); *Ballenger v. Ballenger*, 694 S.W.2d 72, 76 (Tex. App.—Corpus Christi–Edinburg 1985, no writ) ("For the purposes of injunctive relief, no adequate remedy at law exists if damages are incapable of calculation or if defendant is incapable of responding in damages."); *accord Molex, Inc. v. Nolen*, 759 F.2d 474, 477-78

contend that the Neighbors had an adequate legal remedy because they (1) could have sought an award of past damages in this case—presumably from other defendants—for temporary loss of use and enjoyment measured by reduction in rental value, and (2) could bring subsequent actions to recover any damages that might occur in the future.

We disagree with these arguments for two reasons. First, just as injunctive relief in nuisance cases is forward-looking,[47] so too is the inquiry whether a plaintiff would have an adequate remedy at law for future nuisance injuries. *See Schneider*, 147 S.W.3d at 284 (observing that adequate legal remedy exists when "awarding both an injunction and damages as to future effects would constitute a double recovery"). Thus, whether the Neighbors could have obtained temporary nuisance damages in this case for past loss of use and enjoyment is not determinative. Rather, the trial court was correct to focus on whether the Neighbors would have an adequate remedy in money damages for Defendants' continuing future activities.

And the trial court was correct, too, not to factor into its adequate remedy analysis the TCEQ's authority to address nuisance odors from

---

(5th Cir. 1985) ("Texas cases construe 'cannot be compensated' to include situations in which the 'defendant is incapable of responding in damages.'" (quoting *R.H. Sanders Corp. v. Haves*, 541 S.W.2d 262, 265 (Tex. Civ. App.—Dallas 1976, no writ)); RESTATEMENT (THIRD) OF TORTS: REMEDIES § 49.

[47] 1 JOHN NORTON POMEROY, EQUITY JURISPRUDENCE § 1937, at 4395 (4th ed. 1918) ("The only purpose of giving equitable relief [in nuisance cases] at all is the prevention of future harm."); JAMES L. HIGH, A TREATISE ON THE LAW OF INJUNCTIONS § 23, at 38 (4th ed. 1905) ("The appropriate function of the writ of injunction is to afford preventive relief only . . . .").

47

poultry operations through administrative and judicial means. *See, e.g.*, TEX. HEALTH & SAFETY CODE § 382.068; TEX. WATER CODE § 26.302. Although "it [is] within the power of the legislature to substitute an adequate legal remedy to prevent such violation, in lieu of injunctive relief," *Tex. & New Orleans R.R. v. Houston Belt & Terminal Ry.*, 227 S.W.2d 610, 613 (Tex. Civ. App.—Galveston 1950, no writ), those are not legal remedies that injured landowners may pursue in court,[48] and the Legislature has not granted the TCEQ jurisdiction to hear landowner complaints regarding such odors.[49]   Such statutes therefore do not

---

[48] *Cf. Rogers v. Daniel Oil & Royalty Co.*, 110 S.W.2d 891, 894 (Tex. 1937) ("When we come to consider the suspense statute, we find that it certainly completely and adequately affords the protesting taxpayer a complete and adequate remedy at law for the principal amount of the tax paid under protest . . . ."); *Bichsel v. Heard*, 328 S.W.2d 462, 464 (Tex. Civ. App.—San Antonio 1959, no writ) ("If the Commission upholds the suspension or dismissal by the Chief, provision has been made for the filing of a suit in the district court for a judicial review of the Commission's decision.").

[49] *See, e.g.*, *Justiss*, 397 S.W.3d at 152 (addressing common-law nuisance suit brought two months after TCEQ issued citation for Category 5 odor violation); *see also Crossman v. City of Galveston*, 247 S.W. 810, 812 (Tex. 1923) ("It is apparent that, even with express legislative sanction, such a definition of a nuisance would be void.  Not even the Legislature can declare that a nuisance which is not so in fact."); *City of Texarkana v. Reagan*, 247 S.W. 816, 817 (Tex. 1923) ("[The City's] own definition of a nuisance, set forth in its ordinance, is not conclusive and binding on the courts.  The question as to whether or not the building is a nuisance remains a justiciable question."); *Stockwell v. State*, 221 S.W. 932, 934 (Tex. 1920) (explaining that administrative determination of nuisance generally "is not conclusive"); *C.C. Carlton Indus., Ltd. v. Blanchard*, 311 S.W.3d 654, 660 (Tex. App.—Austin 2010, no pet.) (holding issuance of permit did not foreclose common-law nuisance liability); *Manchester Terminal Corp. v. Tex. TX TX Marine Transp., Inc.*, 781 S.W.2d 646, 650-51 (Tex. App.—Houston [1st Dist.] 1989, writ denied) (same); HIGH § 29, at 46 ("[B]y a legal remedy within the meaning of the rule, which will operate as a bar to relief in equity by injunction, is meant a remedy which can be found in the courts of the same state.").

"substitute an adequate legal remedy for the equitable remedy" of abatement by injunction. *Lone Star Gas Co. v. State*, 153 S.W.2d 681, 699 (Tex. 1941).

Indeed, the TCEQ's former Chairman testified at trial that he was "not familiar" with the treatment of nuisances under the common law and acknowledged that the "TCEQ is not the only avenue" for addressing nuisances. Instead, the chapter of the Water Code addressing enforcement provides that "[n]othing in this chapter affects the right of a private . . . individual to pursue any available common law remedy to abate a condition of pollution or other nuisance, to recover damages to enforce a right, or to prevent or seek redress or compensation for the violation of a right or otherwise redress an injury." TEX. WATER CODE § 7.004; *see also id.* §§ 7.005 ("This chapter does not exempt a person from complying with or being subject to other law."), 7.257(b) (providing that permit defense in suit for greenhouse gas emissions under Chapter 7 "does not apply to nuisance actions solely based on a noxious odor").[50]

---

[50] Thus, we disagree that the "legislative and regulatory scheme" specifies "the degree of odor a chicken farm lawfully may emit." *Post* at 13-14 (Huddle, J., concurring in judgment). Furthermore, the record at trial was sufficient to illustrate the impracticality—and therefore inadequacy—of the Neighbors' reliance on the TCEQ's enforcement authority. Not only did a TCEQ representative testify that it was unable to obtain an adequate Strategic Odor Control Plan or achieve compliance, but the Neighbors testified to the recurrence of long delays between their complaints to the TCEQ and investigators' arrival to verify the smell. *Cf. Sumner v. Crawford*, 41 S.W. 994, 995 (Tex. 1897) ("We do not think a court of equity should turn away the trustee seeking its aid in the execution of the trust, because of the existence of a remedy so doubtful as to its adequacy."). In other words, this is not a scenario where "the nuisance is likely to be removed by any agency." *Rosenthal v. Taylor, Bastrop & Houston Ry.*, 15 S.W. 268, 269 (Tex. 1891).

Second, Defendants' argument that the Neighbors can bring future suits must be evaluated in light of the statutory and judicial developments that have shaped the equitable inquiry of inadequate remedy in nuisance cases. Indeed, both the Legislature and this Court have rejected Defendants' view that inadequate remedy is an inflexible inquiry that applies in just the same way to all types of cases.

By statute, "[a] writ of injunction may be granted if . . . irreparable injury to real or personal property is threatened, *irrespective of any remedy at law*." TEX. CIV. PRAC. & REM. CODE § 65.011(5) (emphasis added). We have construed this portion of the statute not as granting plaintiffs "a choice" between equitable and legal remedies, but as authorizing courts to grant an equitable remedy in such cases when there is no "clear, full, and adequate relief at law." *Storey v. Cent. Hide & Rendering Co.*, 226 S.W.2d 615, 619 (Tex. 1950) (quoting *Hill v. Brown*, 237 S.W. 252, 255 (Tex. Comm'n App. 1922, judgm't adopted)).[51] Defendants have not challenged on appeal the trial court's conclusion that the irreparable injury requirement is satisfied. And we have noted the "unique" nature of "every piece of real estate" as "an element to be considered" in the inadequate remedy analysis. *Butnaru v. Ford Motor*

---

[51] We note that this portion of the statute still requires irreparable injury, *see Town of Palm Valley v. Johnson*, 87 S.W.3d 110, 111 (Tex. 2001), a concept that involves many of the same considerations as inadequate remedy in nuisance cases. *See, e.g.*, POMEROY §§ 1927, at 4371, 1937, at 4395; 6 L. HAMILTON LOWE, TEXAS PRACTICE: REMEDIES § 114, at 158 (2d ed. 1973). No party has asked us to reconsider this construction of the statute.

*Co.*, 84 S.W.3d 198, 209 (Tex. 2002); *see also id.* at 211 ("[A] trial court may grant equitable relief when a dispute involves real property.").[52]

In addition, the Commission of Appeals cautioned long ago that for "courts administering both law and equity, like ours, the rules denying injunction when there is a remedy at law should not be applied as rigidly as at common law where the issuance of the writ in equity was, to a certain extent, an invasion of the jurisdiction of another tribunal." *Hill*, 237 S.W. at 254. Instead, so long as "the applicant shows a clear right to be left in the undisturbed possession of certain property and that such right is about to be invaded without semblance of right by another," then "such invasion, on principle, *should be prevented in its incipiency by injunction*, instead of allowing the injury to be inflicted and then leaving the party to his *legally adequate, but in fact generally very inadequate*, remedy of an action for damages." *Id.* (emphases added).

In the decades since *Hill*, we have likewise emphasized the necessity of affording *actually* rather than *theoretically* adequate relief. Thus, we have said that the remedy at law must be "as practical and efficient to the ends of justice and its prompt administration as the remedy in equity." *Brazos River Conservation & Reclamation Dist. v. Allen*, 171 S.W.2d 842, 846 (Tex. 1943) (quoting *Watson v. Sutherland*,

---

[52] *Accord Gilbert Wheeler*, 449 S.W.3d at 482 ("[E]ven when . . . the value of the land has not declined, we have held that the injured party may nevertheless recover for the trees' intrinsic value. This exception was created to compensate landowners for the loss of the aesthetic and utilitarian value that trees confer on real property."); *Cheniere Energy, Inc. v. Parallax Enters., LLC*, 585 S.W.3d 70, 76-77 (Tex. App.—Houston [14th Dist.] 2019, pet. dism'd) ("Money damages are generally adequate to compensate an injured party *unless the loss at issue is considered legally unique or irreplaceable . . . .*" (emphasis added) (internal quotation marks omitted)).

72 U.S. (5 Wall.) 74, 78 (1866)); *see also Henderson v. KRTS, Inc.*, 822 S.W.2d 769, 773 (Tex. App.—Houston [1st Dist.] 1992, no writ) ("For a legal remedy to be adequate, it must give the plaintiff *complete, final, and equal* relief." (emphasis added)).[53]

Applying these standards to the temporary yet recurring nuisance in this case shows that the Neighbors lack an adequate remedy at law. Legal damages available for a temporary interference with the use and enjoyment of land can be "calculated as loss of rental value, . . . or use value, . . . or possibly the cost of restoring the land." *Crosstex*, 505 S.W.3d at 610 (citations omitted).[54] As that interference recurs, "a

---

[53] *See also Tex. Black Iron, Inc.*, 527 S.W.3d at 584 ("For purposes of determining whether to grant [injunctive relief], an adequate remedy at law is one that is as complete, practical, and efficient to the prompt administration of justice as is equitable relief."); *Recon Expl., Inc. v. Hodges*, 798 S.W.2d 848, 851 (Tex. App.—Dallas 1990, no writ) ("The test for determining if an existing remedy is adequate is whether the remedy is as complete, practical, and efficient to the ends of justice and its prompt administration as is equitable relief."); *Surko Enters., Inc. v. Borg-Warner Acceptance Corp.*, 782 S.W.2d 223, 225 (Tex. App.—Houston [1st Dist.] 1989, no writ) ("An existing remedy is adequate if it is as complete and as practical and efficient to the ends of justice and its prompt administration as is equitable relief." (internal quotation marks omitted)); RESTATEMENT (THIRD) OF TORTS: REMEDIES § 43(c).

[54] *Accord Schneider*, 147 S.W.3d at 276 ("It has long been the rule in Texas that if a nuisance is temporary, the landowner may recover only lost use and enjoyment (measured in terms of rental value) that has already accrued."); *Houston Unltd., Inc. Metal Processing v. Mel Acres Ranch*, 443 S.W.3d 820, 826 (Tex. 2014) ("[A] landowner can recover lost fair market *or* the cost to repair or restore and loss of use, but not both."); *C.C. Carlton Indus.*, 311 S.W.3d at 660, 663 (noting that the "appropriate measure of property damage" for temporary injuries to property "is repair cost and lost rent" or "the amount necessary to place property owners in the same position they occupied prior to the injury"); *Buttross V., Inc. v. Victoria Square Condo. Homeowners Ass'n*, No. 03-09-00526-CV, 2010 WL 3271957, at *5 (Tex. App.—Austin Aug. 18, 2010, pet. denied) (explaining that "appropriate measure of property damage is repair

claimant must bring a series of suits involving the same parties, pleadings, and issues." *Schneider*, 147 S.W.3d at 278. Thus, obtaining full relief for this kind of nuisance can require multiple and frequent suits, and we have recognized the costly and inefficient nature of such suits as a basis for holding the legal remedies inadequate. *See id.* (noting "substantial costs" of separate suits when nuisance injury occurs several times per year compared to once per decade).[55]

As we reiterated recently, "if an otherwise complete and adequate remedy at law will lead to a multiplicity of suits, *that very fact* prevents it from being complete and adequate." *Campbell v. Wilder*, 487 S.W.3d 146, 152 (Tex. 2016) (emphasis added) (internal quotation marks

cost and lost rent (temporary)"); *GTE Mobilnet of S. Tex., Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) ("[L]oss-of-use-and-enjoyment damages compensate claimants for their personal discomfort, annoyance, and inconvenience."); DAN B. DOBBS & CAPRICE L. ROBERTS, LAW OF REMEDIES: DAMAGES, EQUITY, RESTITUTION § 5.1(1), at 508 (3d ed. 2018) ("[T]he damages may be measured either by reduced market value of the land or reduced rental value . . . . Plaintiff[s] in such cases may also recover for personal illness or inconvenience caused by the nuisance."). Courts have also considered "harm to the plaintiffs' health, or psychological harm to the plaintiffs' 'peace of mind' in the use and enjoyment of their property" as properly recoverable. *Bruington v. Chesmar Homes, LLC*, No. 08-23-00015-CV, 2023 WL 6972987, at *8 (Tex. App.—El Paso Oct. 20, 2023, no pet.) (quoting *Crosstex*, 505 S.W.3d at 596).

[55] At any rate, the Right to Farm Act "bar[s] a nuisance action against a lawful agricultural operation one year after the commencement of the conditions or circumstances providing the basis for that action." *Holubec I*, 111 S.W.3d at 38; *see also* TEX. AGRIC. CODE § 251.004(a) ("No nuisance action . . . may be brought against an agricultural operation that has lawfully been in operation and substantially unchanged for one year or more prior to the date on which the action is brought."). Therefore, even if the burden of multiple suits did not render such suits inadequate as a remedy, Defendants' position that subsequent nuisance suits for future damages would provide an adequate remedy is nonetheless fundamentally flawed.

omitted); *see Repka*, 186 S.W.2d at 546 ("It is firmly established that equity will assume jurisdiction for the purpose of preventing a multiplicity of suits, the general principle being that the necessity of a multiplicity of suits in itself constitutes the inadequacy of the remedy at law . . . ."); *Rogers v. Daniel Oil & Royalty Co.*, 110 S.W.2d 891, 896 (Tex. 1937) (same). This doctrine aligns with traditional principles of equity jurisdiction, which recognize the prevention of multiple suits among the same parties raising the same issues as a basis for granting injunctive relief.[56]

Courts both in Texas and nationwide apply this doctrine to hold damages inadequate in cases involving recurring nuisances in particular. *See Holubec II*, 214 S.W.3d at 656 ("Monetary damages are not always an adequate remedy in situations where the nuisance is of a recurring nature because . . . a multiplicity of suits would be necessary."); *Ellen*, 410 S.W.2d at 465 (holding no adequate remedy in case involving temporary nuisance from raising chickens because "the nuisance is of a recurring nature . . . and a multiplicity of suits would be necessary" (internal quotation marks omitted)).[57]

---

[56] *See* RESTATEMENT (THIRD) OF TORTS: REMEDIES § 48; POMEROY § 245, at 394-95.

[57] *See also Hot Rod Hill Motor Park v. Triolo*, 276 S.W.3d 565, 572, 575 (Tex. App.—Waco 2008, no pet.) ("In such circumstances, monetary damages are not always adequate because . . . a multiplicity of suits would be necessary." (internal quotation marks omitted)); *Beathard Joint Venture v. W. Houston Airport Corp.*, 72 S.W.3d 426, 432 (Tex. App.—Texarkana 2002, pet. denied) ("[W]here the remedy at law is inadequate *because of the nature of the injury or the multiplicity of actions* necessary to obtain re-dress . . . , the requirements of no adequate remedy at law and irreparable damage are satisfied." (emphasis added)); *City of Princeton v. Abbott*, 792 S.W.2d 161, 165 (Tex. App.—Dallas

As we have explained, "[a] court may decide to abate a nuisance whether it is temporary or permanent." *Crosstex*, 505 S.W.3d at 610 (internal quotation marks omitted). Not only are repeated suits wasteful in cases involving temporary yet recurring nuisances, the damages for interference with use and enjoyment available in each suit are difficult to value adequately and thus unlikely to provide much incentive for the defendant to moderate the nuisance injury over time.[58]

---

1990, writ denied) ("Certainly, it would not be acceptable to deny the Abbotts the expenses contested by the City, and to force them to sue for damages after each heavy rain, for that would be a most *un*satisfactory and incomplete compensation . . . ."); *Lamb v. Kinslow*, 256 S.W.2d 903, 905 (Tex. Civ. App.— Waco 1953, writ ref'd n.r.e.) (noting that "the nuisance here complained of is of a recurring nature"); *Pauli v. Hayes*, No. 04-17-00026-CV, 2018 WL 3440767, at *9 (Tex. App.—San Antonio July 18, 2018, no pet.) ("When the evidence shows the nuisance is recurring in nature and the plaintiffs will continue to experience the nuisance caused by the defendants' activities, the trial court may award permanent injunctive relief to afford complete relief."); POMEROY § 1930, at 4383 ("[T]he weight of authority holds that the mere existence of a continuing or recurring nuisance, . . . provided only it is sufficient to sustain an action at law for damages, will support a bill for injunction."); HIGH § 739, at 701 ("The foundation for the interference of equity in restraint of nuisance rests in the necessity of preventing irreparable mischief and multiplicity of suits.").

[58] *See, e.g.*, *Butnaru*, 84 S.W.3d at 204 (explaining that injury is irreparable "if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard"); RESTATEMENT (THIRD) OF TORTS: REMEDIES § 47; POMEROY §§ 1928, at 4373 (noting difficulty of compensating for loss of enjoyment of land), 1931, at 4386 ("[W]henever the estimate of damages recoverable at law must be based largely, or to any considerable degree, upon conjecture, the legal remedy cannot be adequate."); HIGH §§ 739, at 701 (explaining that equity will restrain a nuisance when "the injury . . . is not susceptible of adequate pecuniary compensation in damages"), 741, at 704-05 ("And especially will [injunctive] relief be granted . . . where the nuisance is a continuing one and the damages recovered at law are nominal and therefore inadequate to prevent a repetition of the wrong."); LOWE § 114, at 158.

Here, the Neighbors not only testified that the fetid odors were ever-present and the risk of sudden stenches destroyed their ability to plan and enjoy outdoor activities, they also presented the jury with their logs documenting 330 instances of nuisance odors, and Defendants' own expert detected an odor of chicken manure 136 times over forty-four days of conducting readings. Furthermore, multiple neighbors testified to their inability to "quantify" or "put a dollar amount" on the lost use and enjoyment of their property. *Cf. Butnaru*, 84 S.W.3d at 204 (holding injury is irreparable "if the damages cannot be measured by any certain pecuniary standard"). Because the neighbors can only obtain full relief by filing new suits periodically, "that very fact prevents [the legal remedy] from being complete and adequate." *Campbell*, 487 S.W.3d at 152.

## III. The trial court had discretion to grant an injunction preventing nuisance-level odors.

Having held that the trial court did not abuse its discretion by determining that the prerequisites to injunctive relief were satisfied, we turn to Defendants' challenge to the scope of the injunction. The trial court granted two types of injunctive relief. First, items 1, 2, and 5 (and their associated definitions) permanently enjoined Defendants from conducting any listed chicken-growing activities "on Defendants' [current properties] or any other real property that is subject to Defendants' ownership or control within (5) five miles of any boundary of Plaintiffs' properties." Second, items 3 and 4 (and their associated definitions) ordered Defendants to "remove and remediate all dead chickens, decaying chickens, chicken waste, byproducts of that waste,

and/or compost material from Defendants' [current properties]" and to "maintain . . . all fly traps that are currently in place." Defendants challenge only the first of these components of the injunction, arguing that the trial court exceeded its discretion by permanently shutting down their lawful place of business.

As we explained in *Storey v. Central Hide and Rendering Co.*, equity does not "authorize the grant of an injunction as a matter of right where the facts present a clear case of nuisance." 226 S.W.2d at 619. Instead, following "well-established principles of equity," the trial court must determine whether, "considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted," as well as ensure "that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Thus, "[a]ccording to the doctrine of 'comparative injury' or 'balancing of equities[,]' the court will consider the injury which may result to the defendant and the public by granting the injunction as well as the injury to be sustained by the complainant if the writ be denied." *Storey*, 226 S.W.2d at 618-19; *see also 1717 Bissonnet, LLC v. Loughhead*, 500 S.W.3d 488, 500 (Tex. App.—Houston [14th Dist.] 2016, no pet.) ("When a jury has found a nuisance, the trial court should balance the equities in deciding whether to issue a permanent injunction, including considering the injury an injunction may cause the defendant or the public and injury that may be suffered by the plaintiffs if the injunction is denied.").[59]

---

[59] *Accord Cowling v. Colligan*, 312 S.W.2d 943, 946 (Tex. 1958) ("The judgment must arise out of a balancing of equities or of relative hardships.");

As illustrated by these authorities and explored in greater detail below, courts traditionally examine the following three kinds of considerations when balancing the equities that favor and oppose enjoining a nuisance: (1) "the relative hardships or the economic costs the parties would be likely to suffer if the nuisance is or is not enjoined";[60] (2) any "public benefit derived from defendant's operations" or "that might result from a grant of the injunction";[61] and (3) the equities among the parties themselves, including matters such as mental states, misconduct, estoppel, and delay.[62]

RESTATEMENT (THIRD) OF TORTS: REMEDIES § 50 (AM. L. INST., Tentative Draft No. 3, 2024).

[60] DOBBS & ROBERTS § 5.7(2), at 533; *see Storey*, 226 S.W.2d at 618 (noting that moving rendering plant would entail a loss of $30,000); *id.* at 617-18 (noting that "the inconvenience and obnoxious odors" were so occasional that "[s]ome of the petitioners' witnesses had not been bothered for as much as three weeks to thirty days" at a time); *id.* at 618 (noting that even without defendant's plant, another type of rendering plant was located a mile away "where animal viscera and bones were left in the open to rot, and create offensive odors and draw flies").

[61] DOBBS & ROBERTS § 5.7(2), at 533; *see Storey*, 226 S.W.2d at 617-18 (noting that defendant's was "the only rendering plant in the county and served the needs of some 75,000 people to promote better sanitary conditions," as well as the public "need for the rendering plant to conserve what would otherwise be wasted" and that, when the plant was established in 1944, "the present location was the only place where all three requisites [for a rendering plant] were found").

[62] DOBBS & ROBERTS § 5.7(2), at 534; *see Storey*, 226 S.W.2d at 618 (noting that defendant "had a plant of the most modern and efficient design," it "was carrying out the latest and best recognized scientific practices to keep down odor and flies," and it "had taken measures to correct the abuses" identified in the plaintiffs' photographs); *id.* at 617 (noting that area surrounding plant had "been developing as an industrial area for a period of time antedating the establishment of this plant").

This balancing accords with our recognition in *Crosstex* that "the analysis of whether to grant injunctive relief against a private nuisance differs from the determination of whether such a nuisance exists, particularly in that it requires the court to consider whether the defendant's conduct or land usage is reasonable." 505 S.W.3d at 610 n.20. In other words, although determining the existence of a nuisance looks to whether "the effects of the substantial interference *on the plaintiff* are unreasonable," *id.* at 597 (emphasis added),[63] the trial court's balancing of the equities also includes considerations like the reasonableness and social utility of the defendant's conduct.[64]

"If the court finds that the injury to the complainant is slight in comparison to the injury caused the defendant and the public by enjoining the nuisance, [injunctive] relief will ordinarily be refused." *Storey*, 226 S.W.2d at 619. "On the other hand, an injunction may issue

---

[63] *See also Crosstex*, 505 S.W.3d at 596-97 n.9 (noting that "the unreasonable-interference requirement [for nuisance liability] does not mean that defendant's conduct must be unreasonable" (internal quotation marks omitted)).

[64] *Accord Ethan's Glen Cmty. Ass'n v. Kearney*, 667 S.W.2d 287, 291 (Tex. App.—Houston [1st Dist.] 1984, no writ) (holding evidence supported trial court's determination "that any relative hardship resulting to the plaintiff was insignificant"); *Monk v. Danna*, 110 S.W.2d 84, 87 (Tex. Civ. App.—Dallas 1937, writ dism'd) ("In such a situation, it is our duty to take into consideration and balance the relative conveniences and hardships of the parties, and determine whether there is probability of a greater damage, if the writ is issued, than that of complaints, if the writ be denied."); *Gill v. Hudspeth County Conservation & Reclamation Dist. No. 1*, 88 S.W.2d 517, 519 (Tex. Civ. App.—El Paso 1935, no writ) ("Another rule frequently applied in determining the propriety of issuing [injunctive relief] is that the court will consider the relative conveniences and hardships of the parties which will result from the granting or refusal of the writ.").

59

where the injury to the opposing party and the public is slight or disproportionate to the injury suffered by the complainant." *Id.* at 619.

As we have recognized, "[i]n modern society . . . industries and nuisances often come in much larger packages, with effects on the public, the economy, and the environment far beyond the neighborhood." *Schneider*, 147 S.W.3d at 287. Thus, "[e]ven privately owned plants creating obnoxious odors may be allowed to continue, depending on where they are located and how badly they are needed." *Id.* But because "[a] nuisance changes the nature and takes away the use and enjoyment of neighboring property without the owner's consent," the more an action "involve[s] only private interests," the more the court should "lean toward granting injunctive relief if other factors do not render it impossible." *Id.* at 289-290.

In addition to the role such balancing plays in the trial court's determination of "whether [the] nuisance should be abated [by injunction], or should [plaintiffs] be relegated to suits for damages," *Storey*, 226 S.W.2d at 617,[65] the same factors likewise inform the scope and details of any injunctive remedy—in particular, whether an injunction should completely or only partially abate nuisance-level conditions. *See* DAN B. DOBBS & CAPRICE L. ROBERTS, LAW OF REMEDIES: DAMAGES, EQUITY, RESTITUTION § 5.7(2), at 533 (3d ed. 2018) (pointing out that "it is [also] important to balance or rebalance the relative costs and hardships [as part of] determining the appropriate remedy"); *cf.*

---

[65] *See also McAfee MX v. Foster*, No. 2-07-080-CV, 2008 WL 344575, at *2 (Tex. App.—Fort Worth Feb. 7, 2008, pet. denied) (observing that trial court conducts balancing analysis "in order to determine if an injunction is appropriate").

*Bhd. of Locomotive Eng'rs v. Mo.-Kan.-Tex. R.R.*, 363 U.S. 528, 532 (1960) ("It is the duty of a court of equity granting injunctive relief to do so upon conditions that will protect all whose interests the injunction may affect." (internal quotation marks omitted)). Because injunctive relief "must not . . . be more comprehensive or restrictive than justified by the pleadings, the evidence, and the usages of equity," *Holubec I*, 111 S.W.3d at 39, these equitable considerations help determine the extent to which the trial court "might simply *limit* [rather than *deny*] relief in accord with its view of the equities or hardships,"[66] including whether to fully or partially abate the nuisance and what level of intervention or oversight is capable of achieving such aims.

We emphasize, however, that balancing the equities does not provide a basis for a trial court to order injunctive measures that go beyond those necessary to abate a nuisance-level condition. *See id.* at 39-40. As we explain in Part IV, because equity is not punitive in nature, trial courts have an obligation to impose no greater restrictions on a defendant's use and enjoyment of its property than necessary to reduce the condition below the nuisance levels found by the jury—that is, below levels that "substantially interfere[] with the use and enjoyment of [the plaintiff's] property by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities attempting to use and enjoy it." Courts may not equate fully abating *nuisance-level* odors with fully abating *all*

---

[66] DOBBS & ROBERTS § 2.4(6), at 84 (emphases added); *see also Holubec I*, 111 S.W.3d at 40 ("[I]njunctions must be narrowly drawn and precise." (internal quotation marks omitted)).

odors or even all offensive odors, as the latter aims fall outside the court's equitable authority to remedy a demonstrated nuisance.[67]

With these principles in mind, we turn to Defendants' arguments that the trial court abused its discretion in crafting the injunction. Because Defendants do not dispute that the equities support permanent injunctive relief in some form, we focus our analysis on the scope of the injunction, which we review for abuse of discretion. *Super Starr Int'l, LLC v. Fresh Tex Produce, LLC*, 531 S.W.3d 829, 849 (Tex. App.—Corpus Christi–Edinburg 2017, no pet.).

Defendants concentrate their arguments overwhelmingly on the balance of the equities at hand, arguing that this balance shows the injunction's scope is overly broad: their poultry farms confer a special public benefit; a shut-down injunction is not appropriate in light of similar industrial and agricultural operations in the same area; they spent millions of dollars constructing permanent structures; the odors imposed only minimal burdens on the neighbors; and more targeted enforcement options were available to and not taken by the TCEQ. Addressing these arguments and the Neighbors' responses is hardly "meander[ing]" in "the chickens' stench [and] the growers' transgressions." *Post* at 2 (Huddle, J., concurring in judgment). Defendants (as petitioners here) are the masters of their briefs,[68] and these arguments "really matte[r] for today's purposes," *id.*—indeed, they

---

[67] *See also post* at 10-11 (Huddle, J., concurring in judgment).

[68] *See Pike*, 610 S.W.3d at 782 ("Our adversary system of justice generally depends on the parties to frame the issues for decision and assigns to courts the role of neutral arbiter of matters the parties present." (cleaned up)).

62

must be addressed first because they would provide greater relief.[69] We therefore consider them as part of our review of the relevant equities in the remainder of Part III, and we conclude that fully abating the nuisance injury was within the trial court's discretion.

But Defendants also argue that even if abatement is appropriate, "abatement [of a nuisance] does not necessarily mean total cessation or termination of the challenged activity." *Schneider*, 147 S.W.3d at 286 n.112 (quoting *Beatty v. Wash. Metro. Area Transit Auth.*, 860 F.2d 1117, 1124-25 (D.C. Cir. 1988)). And as we explain in Part IV, this record does not show that completely closing down the Growers' operation in perpetuity—which must be a last resort—is the only way to reduce the odors below nuisance levels. Rather, the evidence and the regulatory scheme, taken together, reveal lesser measures that should be explored. The trial court therefore abused its discretion by granting a permanent shut-down injunction as its very first remedy.

### A.    The relative hardships of the parties

### 1.    Hardship to the Neighbors

We begin our review of the equities with evidence of the relative hardships or economic costs the parties would be likely to suffer if the

---

[69] Specifically, if Defendants are correct that the balance of the equities favors an injunction that only partially abates nuisance-level conditions (the issue we address next), they would receive greater relief (*i.e.*, a narrower injunction) than if they are correct that this injunction does more than necessary to fully abate those conditions (the issue we address in Part IV). *See, e.g.*, *Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999) ("Generally, when a party presents multiple grounds for reversal of a judgment on appeal, the appellate court should first address those points that would afford the party the greatest relief.").

nuisance is or is not enjoined.  As to the Neighbors, "[i]t is elementary that every citizen has the right to the enjoyment of his home without hurt or injury from any unlawful acts or conduct of his neighbor, and that no person has the right to make such use of his property as unlawfully works hurt or injury to his neighbor." *Fields Sewerage Co. v. Bishop*, 30 S.W.2d 412, 415 (Tex. Civ. App.—Dallas 1930, writ ref'd). Here, the trial court adopted the jury's finding that Defendants' operations substantially interfered with the Neighbors' use and enjoyment of their land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities.

Almost every neighbor who testified opined that—depending on the wind and humidity—the smell from the chicken farms was sometimes "kind of light" but "never pleasurable," while at other times it was "disgusting" and so "unbearable" that "[y]ou don't want to be outdoors at all."  The interference with the Neighbors' use and enjoyment of their property at issue is not a "merely nominal or theoretical" injury. *Simon v. Nance*, 142 S.W. 661, 663 (Tex. Civ. App.—Austin 1911, no writ).  More than one neighbor testified to each of the following: (1) part of the subjective value of their property stemmed from their affinity for the outdoors; (2) they never noticed such offensive odors before the chicken farms began operating; (3) the smell was always present in some degree and sometimes so offensive that it made them gag or physically ill; (4) they had to curtail outdoor activities they previously enjoyed on their property such as hiking, horseback riding, and baseball; and (5) they lost the ability to entertain family and other guests, whether that was because they were too embarrassed to invite

64

company or, in some instances, because the smell caused their guests to leave or refuse to return.

Although Defendants point to evidence that one neighbor, Charlyne Hughes, never smelled the chicken farms and another, Emily Martinez, testified that the odor came and went in a moment, we are unpersuaded that such evidence necessarily constrained the trial court's discretion for three reasons. First, the jury credited those witnesses who testified that a nuisance existed, and the trial court was not required to credit one neighbor's subjective assessment of the odors over another's. *See City of Keller*, 168 S.W.3d at 819, 821 ("[The fact finder] may choose to believe one witness and disbelieve another," and courts "must assume [the fact finder] made all inferences in favor of their verdict, if reasonable minds could."). The trial judge and the jury weighed any conflicts in the neighbors' observations and assessments of the odors as part of making their findings, which Defendants have not challenged as unsupported by sufficient evidence.

Second, testimony from a neighbor who lived upwind of the chicken farms (Charlyne Hughes) does not undercut the trial court's findings with respect to other neighbors who lived downwind of the farms. Indeed, even Defendants' own expert, Dr. Mullin, conceded that such assessments not only vary from person to person, but also that *his* team detected odor from the chicken farms over 130 times in forty-four days of sampling.

Third, as we recognized in *Schneider*, "air-quality complaints like those here may be worse under certain conditions, but no one would presume the wind will never change." 147 S.W.3d at 283. It is therefore

65

not determinative that the odor was sometimes evanescent given that other testimony—as detailed above—indicates the odor would periodically persist for days at a time.

Alternatively, Defendants suggest that the marginal impact of their operations on the Neighbors was insignificant given existing land usage in the area. For example, one neighbor agreed that "there's pastureland dotted throughout this part of Henderson County," including "pastureland even a mile south of" the two chicken farms. Defendants also point to *Storey*, which involved a second rendering plant within one mile of the defendant's plant that likewise created offensive odors and drew flies, in addition to evidence that the area "ha[d] been developing as an industrial area for a period of time antedating the establishment of th[e] plant." 226 S.W.2d at 617.

In this case, however, the record indicates that existing agricultural operations were on a much smaller scale than the chicken farms. For example, the Blanchards own about fifty-six cows and pasture another sixty to eighty cows on their 1,200 acres, and Tanya Berry's seven-acre property contains horses, horse stalls, and a hay barn. In contrast, Defendants house over 400,000 birds on only 230 acres in densely packed barns that offer roughly one square foot per chicken. Moreover, several neighbors—as well as Defendants' expert— testified that the odor from the chicken farms was distinct from and more offensive than odors produced by the cows or horses.

### 2. Hardship to Defendants

Regarding their own hardship, Defendants rely primarily on the cost of the permanent structures they built on the property, our

recognition in *Storey* that "[a]n abatement of a lawful place of business is a harsh remedy," 226 S.W.2d at 618, and decisions by some courts of appeals that the equities in particular cases weighed against permanently shuttering a lawful business.[70]  But as we have explained, "the law does not allow one to be . . . compelled to live in substantial . . . discomfort even though [it] is caused by a lawful and useful business." *Crosstex*, 505 S.W.3d at 593 (internal quotation marks omitted); *see also Pool v. River Bend Ranch, LLC*, 346 S.W.3d 853, 860 (Tex. App.—Tyler 2011, pet. denied) ("The right to acquire a known property and to deal with it and use it as the owner chooses . . . is qualified by the obligation that the use of the property shall not be to the prejudice of others.").

We also recognized in *Storey* that "the cases in which a nuisance is permitted to exist under [the balancing of equities] are based on the stern rule of necessity" of the operation to the public—a factor not shown here as we explain next—"rather than on the right of the author of the nuisance to work a hurt, or injury to his neighbor."  *Id.* at 619; *Fields Sewerage Co.*, 30 S.W.2d at 415 (observing that "[n]ecessity of others" in community can require injured party to seek relief in damages rather than injunction).  Indeed, "in actions that involve only private interests, there is an important reason for trial judges to lean toward granting injunctive relief if other factors do not render it impossible": a nuisance

---

[70] *See, e.g.*, *Atchison, Topeka & Santa Fe Ry. Co. v. Parmer*, 496 S.W.2d 241 (Tex. App.—Austin 1973, no writ); *Lee v. Bowles*, 397 S.W.2d 923 (Tex. App.—San Antonio 1965, no writ); *Garland Grain Co. v. D-C Home Owners Improvement Ass'n*, 393 S.W.2d 635, 641-43 (Tex. App.—Tyler 1965, writ ref'd n.r.e.); *Hill v. Villarreal*, 383 S.W.2d 463 (Tex. App.—San Antonio 1964, writ ref'd n.r.e.); *Georg v. Animal Def. League*, 231 S.W.2d 807 (Tex. App.—San Antonio 1950, writ ref'd n.r.e.).

"takes away the use and enjoyment of neighboring property without the owner's consent," but "private entities usually do not" have "the power to take property pursuant to eminent domain." *Schneider*, 147 S.W.3d at 289-290. Thus, "courts may well favor the equitable option allowing neighboring owners to stop the uninvited nuisance, rather than the legal option forcing them to live with it and sending them a check." *Id.* at 290.

For these reasons, depriving Defendants of the ability to grow more than twice the volume of chickens "considered likely to create a persistent nuisance odor" within one-fourth to one-half mile of several neighbors, 31 TEX. ADMIN. CODE § 523.3(j)(3)(A),[71] is not a weighty hardship. Moreover, Defendants' argument rests on a faulty premise because theirs is not a lawful business.[72]

To the contrary, the trial court made the unchallenged finding that "[o]ne or more Defendants have . . . made misrepresentations to various Texas and federal agencies." More importantly, applicable regulations provide that the Growers cannot operate at all without

---

[71] *See also* TEX. HEALTH & SAFETY CODE § 382.085(b) ("A person may not cause, suffer, allow, or permit the emission of any air contaminant or the performance of any activity in violation of this chapter or of any [TCEQ] rule or order."); 30 TEX. ADMIN. CODE § 101.4 ("No person shall discharge from any source whatsoever one or more air contaminants . . . in such concentration and of such duration as . . . to interfere with the normal use and enjoyment of animal life, vegetation, or property.").

[72] Of course, raising chickens is often a lawful activity. And businesses that violate applicable legal standards in the course of their operations frequently face consequences that do not render continued operations unlawful. But here, as we explain, Defendants unlawfully obtained a permit to begin their operations, and they refused to alter their continuing operations to comply with either the TCEQ's instructions or the jury's verdict. In this respect, we disagree with our concurring colleagues. *Cf. post* at 2 (Huddle, J., concurring in judgment).

either obtaining their neighbors' consent, *id.* § 523.3(j)(3)(D), or "provid[ing] an odor control plan the [TCEQ] determines is sufficient to control odors," *id.* § 523.3(j)(3). The Growers did neither.

As explained in Part B. of the background section above, because Defendants made misrepresentations on their initial questionnaires, they were able to begin nuisance-producing operations and incur three NOVs before triggering the TCEQ's authority to require a comprehensive agreement regarding odor control. If Defendants had been honest at the outset, the TCEQ would have been involved at a much earlier stage—before either farm began receiving chicks—and therefore able to impose better practices and special mitigation measures to account for the increased risk of nuisance associated with the size of Defendants' proposed operations.

Instead, Defendants did not obtain the necessary TCEQ determination that their plans were sufficient to control odors, and they misrepresented facts and omitted required information necessary to a proper determination.[73] Indeed, each of the Defendants have conceded that the Growers provided false information about the existence of nearby neighbors to the TCEQ as part of their initial permitting process. Defendants have likewise admitted that they failed to either identify or consider the prevailing wind direction, as the TCEQ required of them.

---

[73] The Neighbors do not argue here that Defendants' regulatory violations render the operation a nuisance *per se* that is subject to abatement without balancing the equities. *See generally Lombardo v. City of Dallas*, 73 S.W.2d 475, 482 (Tex. 1934); *Stoughton v. City of Fort Worth*, 277 S.W.2d 150, 153 (Tex. Civ. App.—Fort Worth 1955, no writ); LOWE § 115, at 163 & n.64. Accordingly, we express no view on that issue.

And Defendants have conceded that the proximity of nearby neighbors, as well as the number of birds per flock that *each* of the two nominally separate farms would house, constitute "[f]actors that are considered likely to create a persistent nuisance odor and will require the proposed facility to submit an odor control plan." *Id.* § 523.3(j)(3)(A).

Although Steve Huynh testified that he complied with the provisions of both the initial Odor Control Plans and the subsequent Strategic Odor Control Plans, the trial court was not required to accept his self-serving testimony, which contradicted that of TCEQ representative Baetz. *See City of Keller*, 168 S.W.3d at 827. Baetz testified that (1) she did not view her meeting with Sanderson to discuss what the Strategic Odor Control Plans would include as successful and could not say "what we were able to accomplish at that meeting"; (2) the Strategic Odor Control Plans and related audit eventually submitted on behalf of the Growers were not received in the manner she requested, addressed only parts of her request, and lacked the level of detail she expected; and (3) although Sanderson "offered some possible corrective measures," the TCEQ "still continued to receive complaints" and was not able to obtain compliance from the two farms or resolve outstanding NOVs. Based on this evidence, the court could determine that the plans themselves, Defendants' implementation, or both were insufficient to contain the odors.

The only remaining hardship Defendants have identified is the expense Steve Huynh and his LLCs incurred in constructing the chicken barns—roughly $300,000 for each of the sixteen barns—and other

70

permanent structures.[74]  Although this expense is properly considered a hardship, the cases just discussed confirm that the trial court was within its discretion to decide that it does not alone preclude an injunction restricting the continued use of those structures to create nuisance conditions.  We address below the extent to which such expense weighs in favor of allowing the farms to continue certain operations subject to stringent oversight or other means of achieving compliance with applicable regulations and ameliorating the Neighbors' harm.

## B. Public benefits from Defendants' operations and from abating their nuisance-level odors

Next, we review the evidence regarding any public benefits from Defendants' operations or from an injunction.  "[I]t is elementary that a court of equity will not remedy a wrong committed against one class of persons by the commission of another wrong against a larger class." *Fields Sewerage Co.*, 30 S.W.2d at 415.  Therefore, "[i]f the effect of [a] judgment of abatement is to visit upon other citizens . . . , greater in number, injuries equal to or greater than a continued operation of the

---

[74] Although Timmy, Thinh, and Yvonne Huynh each have some equity stake in one or both of the LLCs, Defendants have not identified any financial hardship specific to Sanderson.  To the contrary, representatives for Sanderson testified that it had partnerships with hundreds of barns operated by other members of its growing program that also house chickens to be processed at Sanderson's plant in Palestine, and that those barns had the excess capacity to house any flocks intended for the Huynhs' barns, including their current flocks.  At least one representative for Sanderson also testified that doing so would not impact Sanderson's profitability, and the trial court reasonably could have relied on such evidence in finding that "Defendant Sanderson has other growers that could absorb the flocks currently being grown by the Defendant Growers with little impact to Defendant Sanderson."

71

[nuisance-producing condition] would visit upon [the plaintiffs], then the judgment is erroneous." *Id.* Defendants made no such showing here.

Lawful agricultural operations are highly beneficial to the public, and they must be carried on somewhere. But "the fact that the business is a useful or necessary one or that it contributes to the welfare and prosperity of the community is not determinative . . . ." *Storey*, 226 S.W.2d at 618. And here, the trial court found that its injunction would not have a negative impact on the supply of either chickens or jobs in the area. Although Defendants' operation of their poultry farms "performs a service for the welfare of the general public," they have not made any showing that "it is the only operation of this sort in this section of the state" or that "the business is particularly adaptable to this" specific location. *Garland Grain Co. v. D-C Home Owners Improvement Ass'n*, 393 S.W.2d 635, 642 (Tex. App.—Tyler 1965, writ ref'd n.r.e.).[75]

To the contrary, one Sanderson representative testified that it has roughly 900 barns servicing two East Texas processing plants and that the sixteen barns at issue involve only two out of one thousand such contracts between Sanderson and other growers in the area. He further testified that Sanderson has sufficient excess capacity across the 884 other barns it partners with in East Texas that it would not even have to sign a contract with a new grower to rehouse the Huynhs' birds. In

---

[75] *Cf. Storey*, 226 S.W.2d at 617 ("At the time the plant was established in 1944, the present location was the only place where all three requisites [to properly operate such a plant] were found."); *Georg*, 231 S.W.2d at 811 ("It does not appear that another location could be selected [for the animal shelter] within a reasonable range of the City of San Antonio that would not be subject to objections similar to those raised by the [complainants] here.").

sum, Defendants' operations "could be as easily and economically carried on [at those barns] where it would give no offense." *Georg v. Animal Def. League*, 231 S.W.2d 807, 810 (Tex. Civ. App.—San Antonio 1950, writ ref'd n.r.e.).[76]

Turning to the benefits from abatement, there is a public interest in enforceable private property rights, which private entities usually lack the power to take without the owner's consent. *See Schneider*, 147 S.W.3d at 289-290. And the applicable statutes and regulations discussed above have already balanced the competing public interests in agriculture and in the undisturbed right to use and enjoyment of property in this specific context, concluding that a chicken farm the size of Defendants' should not be located so close to downwind neighbors without either their consent or effective odor-control measures. *See* TEX. WATER CODE § 26.302(b-3); 31 TEX. ADMIN. CODE § 523.3(j)(3); *see also* DOBBS & ROBERTS § 5.7(2), at 533-34.

Moreover, if the Huynhs' compliance with their unapproved Strategic Odor Control Plans falls short of the regular practices of Sanderson's other growers (as discussed below in Part IV), then reallocating Sanderson's flocks to other farms less likely to produce nuisance-level odors would constitute a public benefit. Similarly, in light of testimony that Sanderson spends roughly $20,000 more per flock grown on Steve Huynh's Malakoff property compared to other farms,

---

[76] *Cf. Garland Grain Co.*, 393 S.W.2d at 642 ("It is undisputed that there is no place in [the surrounding] counties where such feed lots could be located where they would not be subject to the same objection by people residing in similar areas.").

redistributing those birds would also benefit the public because it would increase utilization of more cost-efficient methods.

## C. Equities among the parties

Finally, with respect to equitable considerations specific to these parties, the trial court considered "the voluminous testimony about how chicken barns in this particular business operate," as well as "the behavior and credibility of Defendant Huynhs versus the [Neighbors]." On one hand, the court found that all of the Neighbors owned their land before the Growers constructed and began operating their barns and observed that the record contained hours of the Neighbors' testimony about the operation's impact "on their quality of life and the use and enjoyment of their land and homes."

On the other hand, the trial court heard a litany of testimony about Defendants' negligence as well as their deliberate efforts to evade state and federal regulations that exist to guard against the very circumstances of which the Neighbors complain. For example, Defendants chose to construct a feeding operation of more than double the recommended size and locate it close to—and upwind of—residential landowners, even though state regulations and Sanderson's own manual warned them that each factor alone was likely to cause a persistent nuisance odor. And to obtain permission to operate in that location, the Huynhs falsely stated on their permit applications that there were no nearby neighbors, did not specify the prevailing wind direction as required, and failed to account for the Neighbors in the required odor control plan. The Huynhs also financed their nuisance operations with federal subsidies that Steve conceded he would not have been entitled

74

to receive had he disclosed his interest in the LLCs as required. This evidence amply supports the trial court's finding that "[o]ne or more Defendants . . . made misrepresentations to various Texas and federal agencies."

More generally, as the trial court found, the Huynhs offered "conflicting, inconsistent and 'concerning' testimony" on a variety of matters, including "who runs the farms, who signed certain governmental documents, . . . who receives the government subsidies, . . . who was answerable to Defendant Sanderson in the operation of the barns, what steps should be taken to abate odors, the cleaning and replacement of chicken litter, etc." These inconsistencies created significant enforcement challenges. For example, until shortly before trial, Timmy was the signatory on Huynh Poultry's contract with Sanderson. But the NOVs were addressed to Steve. And Sanderson handled the meetings and negotiations with the TCEQ regarding the Strategic Odor Control Plan. Even if the TCEQ chose to proceed by bringing an enforcement action, it is not clear which or how many of the Defendants it would have to bring the action against.

As it stands, the trial court found and the record shows that the TCEQ's compliance efforts have had little to no effect on Defendants. *Storey* again provides an instructive comparison. There, the defendant "spent much money in modernizing its plant," "satisfied the State Department of Health with regard to the sanitary operation of its plant," and presented evidence that it "was carrying out the latest and best

recognized scientific practices to keep down odor and flies." 226 S.W.2d at 618.[77]

Here, in contrast, TCEQ representatives not only testified that Defendants' Strategic Odor Control Plans were insufficiently detailed, but also cast doubt on whether the Huynhs and their employees were actually implementing the practices they did describe.[78] Defendants' strategy of non-compliance also extended to continuing their two-farm misrepresentation as part of a frivolous challenge to one of their NOVs, thereby hampering the TCEQ from proceeding with enforcement and extending the time period in which the TCEQ was precluded from issuing additional NOVs despite its verification of nuisance odors on subsequent occasions. *Cf. Houston Fed'n of Tchrs., Loc. 2415 v. Houston Indep. Sch. Dist.*, 730 S.W.2d 644, 646 (Tex. 1987) ("[I]f the agency is unable to provide relief, the courts may properly exercise their jurisdiction in order to provide an adequate remedy [by injunction].").

The trial court ultimately found that—despite voluminous and well-documented complaints and the TCEQ's verification of nuisance odors from the farms on multiple occasions—the "Defendants deny that a nuisance exists and have either taken no or insufficient measures to

---

[77] *See also Garland Grain Co.*, 393 S.W.2d at 642 ("It is conceded that defendants operate the business by the most modern and up-to-date methods, including the use of modern chemicals to prevent odors, and that there is no negligence.").

[78] After the TCEQ investigated the Growers' farms, it amended its Enforcement Initiation Criteria to provide that "[i]f a poultry facility violates a nuisance order [compliance agreement], an enforcement action referral should be initiated." *Enforcement Initiation Criteria (EIC), Revision No. 17*, TEX. COMM'N ON ENV'T QUALITY 8 (Sept. 1, 2020), https://www.tceq.texas.gov/downloads/compliance/enforcement/eic/enforcement-initiation-criteria.pdf.

reduce the odor pollution." The trial court also observed that Defendants "admit that if an injunction does not issue, they will continue to conduct their Activities in the future in exactly the same way they have done in the past," demonstrating deliberate indifference to the unlawfulness or external effects of their operations.[79]

\*　　\*　　\*

Taking these equitable considerations together, we hold the trial court did not abuse its discretion in concluding that the balance tips in favor of an injunction that fully abates the Neighbors' injury from nuisance-level odors. But as Defendants point out, it cannot be assumed that abatement is the same as shutting down their business altogether. *Schneider*, 147 S.W.3d at 286 n.112. We therefore turn to reviewing the trial court's determination that "a more narrow injunction [was] not economic or feasible."

## IV. The trial court abused its discretion by issuing an injunction broader than necessary to abate nuisance-level odors.

We conclude that the trial court abused its discretion by shutting down Defendants' entire operation permanently as its very first remedy, and by barring them from conducting any husbandry activities within a five-mile radius. When supported by the balancing we have just

---

[79] *Cf. Hall v. Seal*, No. 04-09-00675-CV, 2011 WL 61631, at \*3 (Tex. App.—San Antonio Jan. 5, 2011, pet. denied) (looking to whether the "evidence shows that the author of the nuisance will not cease the nuisance without a court order"); *see also Reeves v. Hooton*, No. 12-12-00259-CV, 2013 WL 4680529, at \*5 (Tex. App.—Tyler Aug. 29, 2013, no pet.) (upholding permanent injunction where nuisance-maker "contended that he would consider ceasing his use of the propane cannon if a magistrate threatened to prosecute him").

described, an "injunction must be in broad enough terms to prevent repetition of the evil sought to be stopped, whether the repetition be in form identical to that employed prior to the injunction or (what is far more likely) in somewhat different form calculated to circumvent the injunction as written." *San Antonio Bar Ass'n v. Guardian Abstract & Title Co.*, 291 S.W.2d 697, 702 (Tex. 1956).[80]  But injunctions also "must be narrowly drawn," *Holubec I*, 111 S.W.3d at 40,[81] and precisely "tailored to address the offending conduct." *TMRJ Holdings, Inc. v. Inhance Techs., LLC*, 540 S.W.3d 202, 212 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

Given these principles, "[t]he record must . . . reflect the need for the injunction at each location where conduct is enjoined, and the evidence must support both the kind of relief granted and the specific restrictions at each location." *Lagos v. Plano Econ. Dev. Bd., Inc.*, 378 S.W.3d 647, 651 (Tex. App.—Dallas 2012, no pet.).  And although appellate courts apply an abuse-of-discretion standard of review,[82] we

---

[80] *Accord Super Starr Int'l, LLC*, 531 S.W.3d at 849 ("But an injunction must be broad enough to prevent a repetition of the wrong sought to be corrected."); *Pool v. River Bend Ranch, LLC*, 346 S.W.3d 853, 860 (Tex. App.—Tyler 2011, pet. denied); *Hitt v. Mabry*, 687 S.W.2d 791, 796 (Tex. App.—San Antonio 1985, no writ).

[81] *See also Schneider*, 147 S.W.3d at 287; *TMRJ Holdings, Inc. v. Inhance Techs., LLC*, 540 S.W.3d 202, 212 (Tex. App.—Houston [1st Dist.] 2018, no pet.) ("An injunction must be as definite, clear, and precise as possible . . . ." (internal quotation marks omitted)); *Super Starr Int'l, LLC*, 531 S.W.3d at 849 (same).

[82] *See Longview Energy Co. v. Huff Energy Fund LP*, 533 S.W.3d 866, 874 (Tex. 2017) ("The scope and application of equitable relief . . . is generally left to the discretion of the court imposing it.").

also have an obligation to police the outer bounds of the trial court's equitable powers. Even when the balance of the equities favors full abatement of nuisance-level conditions, a permanent injunction must be no broader than necessary to reduce those conditions to levels that a person of ordinary sensibilities would not regard as unreasonably annoying. *See Holubec I*, 111 S.W.3d at 39-40.[83] Thus, "the entry of an injunction that enjoins [non-nuisance producing] as well as [nuisance producing] acts may constitute an abuse of discretion." *Webb v. Glenbook Owners Ass'n, Inc.*, 298 S.W.3d 374, 384 (Tex. App.—Dallas 2009, no pet.).[84]

---

[83] *See also* RESTATEMENT (THIRD) OF TORTS: REMEDIES § 44 (Tentative Draft No. 2, 2023).

[84] As we have previously recognized, "a defendant's conduct that is useful and lawful in itself can nevertheless create a nuisance if the conduct creates an unreasonable interference with the plaintiffs' use and enjoyment of their land." *Crosstex*, 505 S.W.3d at 597 (internal quotation marks omitted). Therefore, we understand the many references by the concurrence and other Texas courts to an equitable limit on enjoining "lawful as well as unlawful acts" as equivalent to an admonition against enjoining conduct or conditions that do not contribute to nuisance-level odors (and are therefore "lawful") together with nuisance-producing (and therefore "unlawful") conduct or conditions. *See, e.g.*, *post* at 10-15 (Huddle, J., concurring in judgment); *TMRJ Holdings, Inc.*, 540 S.W.3d at 212 ("[An injunction] must not be so broad that it would enjoin a defendant from acting within its lawful rights."); *accord RCI Ent. (San Antonio), Inc. v. City of San Antonio*, 373 S.W.3d 589, 603 (Tex. App.—San Antonio 2012, no pet.); *Webb*, 298 S.W.3d at 384 ("Where a party's acts are divisible, and some acts are permissible and some are not, an injunction should not issue to restrain actions that are legal [*i.e.*, non-nuisance producing] or about which there is no asserted complaint."); *Pool*, 346 S.W.3d at 860 ("An injunction must not be so broad, however, that it enjoins a defendant from activities that are lawful and the proper exercise of his rights."); *Adust Video v. Nueces County*, 996 S.W.2d 245, 252 (Tex. App.—Corpus Christi–Edinburg 1999, no pet.) ("Where the acts of the parties are divisible regarding lawful and unlawful conduct, an injunction may not be framed so broadly so as to prohibit

As explained below, we conclude that the trial court committed three principal errors in defining the scope of relief in parts 1, 2, and 5 of the injunction. First, the trial court expressly relied on improper considerations in reaching its conclusions regarding scope. Second, the injunction's breadth is not supported by the evidence. And third, the trial court failed to address the relative hardships and other equities as to each Defendant, which it should consider in crafting a narrower injunction on remand.

A. **Using improper factors in setting the injunction's scope**

In determining the scope of this injunction, the trial court observed that it "considered more narrow options" but concluded it would not be "economic or feasible" to "shu[t] just one of the two farms down or reduc[e] flock size, . . . nor would it be equitable to do so partly based on weighing the behavior and credibility of Defendant Huynhs versus the Plaintiffs." We conclude the trial court abused its discretion by erroneously assuming the nuisance odors could not be fully abated without permanently shutting down Defendants' entire operations at the Malakoff locations and by relying on the equities to support such a broad injunction.

First, the court relied on the behavior and credibility of the parties to conclude that a narrower injunction would not be "equitable."

---

the enjoyment of lawful rights."); *Hellenic Inv., Inc. v. Kroger Co.*, 766 S.W.2d 861, 866 (Tex. App.—Houston [1st Dist.] 1989, no writ) ("[A]n injunctive decree should not be framed so broadly as to prohibit the enjoyment of lawful rights.").

80

But equity is not punitive in nature;[85] it does not permit a court to issue an injunction broader than necessary to remedy the particular injury in question: here, odors causing unreasonable discomfort or annoyance on the Neighbors' properties.  Thus, if a nuisance-level odor on neighboring property can be corrected by restraining or altering only parts of Defendants' conduct, that is the outer limit of the court's injunctive authority.  *See Webb*, 298 S.W.3d at 384 ("Where a party's acts are divisible, and some acts are permissible and some are not, an injunction should not issue to restrain actions that [do not contribute to nuisance conditions] or about which there is no asserted complaint.").

Instead, courts can often exercise their discretion to fashion various means of abating particular nuisance-level injuries short of permanently enjoining a defendant's operations entirely.  *See* DOBBS & ROBERTS § 2.4(6), at 85-86; *id.* § 5.7(3), at 541 (collecting cases).  For example, courts can "injunctively proscribe the operation effective at some future time unless defendant is able to show the court before the cut-off date that the nuisance has been materially reduced."  *Id.* § 5.7(3), at 541.  And while "[j]udges may hesitate to issue discretionary orders that require extensive oversight, or risk conflicts with other governmental regulations and agencies," *Schneider*, 147 S.W.3d at 287, "[i]ntractable cases may call for continued experiment, perhaps under court supervision, in an effort to find a way to minimize the harm" to all parties.  DOBBS & ROBERTS § 5.7(3), at 540.

---

[85] *Hyde Corp. v. Huffines*, 314 S.W.2d 763, 780 (Tex. 1958).

Second, a court's view that a defendant's remaining business would not be "economic or feasible" once its operations have been modified to prevent them from generating nuisance-level odors that drift onto neighboring property provides no basis for issuing broader injunctive relief. Again, a court may go no further than necessary to remedy the plaintiff's injury. *Holubec I*, 111 S.W.3d at 39-40. Whether a defendant finds it economical or desirable to continue operating under such modifications is up to that defendant.[86]

## B. Imposing restrictions harsher than the record supports

The trial court also abused its discretion because the breadth of the injunction does not conform to the evidence and topics addressed by the parties. The injunction permanently ordered Defendants to cease a long list of "Activities"[87] involved in growing chickens "on Defendants'

---

[86] Indeed, "Texas courts have recognized the so-called economic feasibility exception," which "applies when the cost of required repairs or restoration [stemming from a nuisance] exceeds the diminution in the property's market value to such a disproportionately high degree that the repairs are no longer economically feasible." *Gilbert Wheeler*, 449 S.W.3d at 481. But the exception merely provides that "[i]n those circumstances, a temporary injury is deemed permanent, and damages are awarded for loss in fair market value," *id.*; it does not broaden or otherwise impact the proper scope of injunctive relief when damages are inadequate. The Neighbors have not invoked the economic feasibility exception in an effort to reinstate the damages awarded by the jury for loss of fair market value, which the trial court disregarded by agreement.

[87] The order defined the prohibited "Activities" to mean "directly or indirectly buying, selling, delivering, receiving, shipping, transporting, hatching, raising, growing, feeding, watering, keeping, processing, harvesting, killing, handling, burying, or disposing of any chickens of any breed, type, size,

[current properties] or on any other real property that is subject to Defendants' ownership or control within (5) five miles of any boundary of Plaintiffs' Properties, except for the remedial actions ordered" as part of the injunction. The court also permanently enjoined Defendants from "allowing any other person to conduct any Similar Activities,"[88] subject to the same geographic restrictions.

These provisions include three principal errors. ***First***, any recommendations made by the TCEQ—the expert agency charged with protecting air quality in Texas—should be a court's starting point in determining what restrictions are necessary to abate nuisance-level

---

or age, or creating, storing, or disposing of chicken waste or carcasses, either to, from, on, or in connection with any portion of Defendants' Properties."

[88] The injunction defined "Similar Activities" as follows:

(1) directly or indirectly buying, selling, delivering, receiving, shipping, transporting, hatching, raising, growing, feeding, watering, keeping, processing, harvesting, killing, handling, burying, or disposing of any breed, type, size, or age of any fowl or poultry other than chickens, including turkeys, guineas, pheasants, geese, quail, pigeons, or any other species of landfowl or waterfowl, or creating, storing, or disposing of fowl or poultry waste or carcasses, either to, from, on, or in connection with any portion of Defendants' Properties; (2) directly or indirectly engaging in any Concentrated Animal Feeding Operation, as defined in 30 Tex. Adm. Code §321.32, whether classified as a "'Large CAFO," a "Medium CAFO," or a "Small CAFO" under such regulation, either to, from, on, or in connection with any portion of Defendants' Properties; or (3) directly or indirectly engaging in any "aquaculture," "fish farming," "commercial aquaculture facility," or "private facility" for any "cultured species" or any "exotic species," as those terms are defined in Tex. Agric. Code Ch. 134 or the regulations enacted pursuant to or under such statute, either to, from, on, or in connection with any portion of Defendants' Properties.

odors. Here, the Neighbors did not show—and the trial court failed to explain—why a sufficiently detailed Strategic Odor Control Plan or any other modifications of Defendants' operations, if approved by the TCEQ and diligently implemented, would be insufficient to remedy the nuisance-level odors on the Neighbors' properties.

For example, there is no indication in the current record that growing hundreds or thousands—rather than tens of thousands—of chickens per barn would cause nuisance-level interference with the Neighbors' use and enjoyment of their properties. To the contrary, Dr. Heber supervised a study of a somewhat smaller operation that involved 21,000 chickens (compared to 27,800 here) in each of sixteen houses that were grown on a forty-six-day (rather than sixty-day) cycle with complete clean-outs of the barns every third cycle (rather than every five years), and there is no evidence indicating that such a smaller-volume operation would likewise produce nuisance-level odors. Nor was there any evidence that the egg-laying operation he studied in Indiana resulted in such odors.

Moreover, both sides point to evidence that narrower options were available and feasible. There was testimony that the TCEQ had recommended a shorter growing cycle, as well as expert testimony that improving the frequency of complete clean-outs of a poultry barn should improve odor control. But the evidence was either lacking or conflicting regarding why Sanderson stuck with its existing choice of fowl type and growing cycle, as well as whether the Huynhs had ever cleaned the Malakoff barns to the degree described in the studies on which the expert relied.

Although the trial court was correct in noting the conflicting evidence regarding "what steps should be taken to abate [the] odors" as well as whether Defendants were willing and able to implement and remain compliant with such practices, the court has discretion (as discussed above) to supervise any ordered modifications and alter them as necessary to ensure that nuisance-level odors are abated. And to the extent the trial court assumed that adequately close and regular monitoring of the implementation of improved practices would be prohibitively inconvenient or costly, the court could consider conditioning Defendants' ability to continue operations on their willingness to allow and fund monitoring. As explained above, the trial court should not have preempted Defendants' right to determine for themselves the feasibility and value of complying with such measures.

Our concurring colleagues suggest that the trial court use as its guide the Strategic Odor Control Plans that Defendants submitted to the TCEQ following the first three NOVs. *Post* at 14 (Huddle, J., concurring in judgment). Although a TCEQ-sanctioned plan is likely to provide sound initial guidance for shaping an injunction in many cases,[89] there is ample evidence here that the TCEQ did not determine the plans were "sufficient to control odors." TEX. HEALTH & SAFETY

---

[89] Of course, a court should also consider any evidence that such a plan will be insufficient to abate nuisance-level odors. For example, Baetz testified that after Defendants submitted their Strategic Odor Control Plans and implemented some corrective actions that the TCEQ felt could possibly eliminate the odor problems, she continued to receive complaints.

CODE § 382.068(d).[90] To the contrary, Baetz testified that each plan addressed only parts of the TCEQ's request, "was not received in the manner that [the TCEQ] asked for," and lacked the level of detail she was expecting. The parties have not addressed whether the plans contain sufficient detail to even be enforceable by injunction. *See, e.g.*, *San Antonio Bar Ass'n v. Guardian Abstract & Title Co.*, 291 S.W.2d 697, 702 (Tex. 1956) (explaining that injunctions must be "definite, clear, and precise").

***Second***, the trial court's prohibition on Defendants or other persons conducting "Similar Activities" incorrectly prohibits conduct that has not been shown to produce similar nuisance injuries. For example, the trial court should not have presumed that housing other types or quantities of fowl would similarly impact the Neighbors. There was no evidence that Defendants had ever done so on the Malakoff property, nor any other evidence from which the trial court could determine whether such hypothetical operations would likewise produce and fail to contain odors of similar severity.

The trial court's even broader restrictions on operating other types of CAFOs, aquaculture, fish farming, or running a commercial aquaculture facility or private facility for any cultured or exotic species

---

[90] As previously discussed, plaintiffs need not complain to the TCEQ at all. *See supra* at 48-49. And whether plaintiffs have complained or not, there may be—as here—no plan that the TCEQ has determined is sufficient to control odors. *See supra* at 7-8, 19-21. Our concurring colleagues view the evidence differently regarding whether the TCEQ determined that the plans were sufficient. *Post* at 14 n.3 (Huddle, J., concurring in judgment). We view the evidence in the light most favorable to the jury's verdict and the trial court's findings. *See Bos v. Smith*, 556 S.W.3d 293, 299-300 (Tex. 2018); *City of Keller*, 168 S.W.3d at 822.

are likewise an abuse of discretion. In addition to the lack of evidence that Defendants had ever conducted such activities on the property themselves, there was no evidence that doing so would likely result in similar nuisance-level odors or necessarily involve similar equitable considerations.

*Third*, based on our review and the parties' statements at oral argument, we conclude the trial court acted arbitrarily in selecting five miles from the Neighbors' properties as the relevant distance for the injunction's geographic scope.[91] As discussed above, state regulations seek to protect residents within one-quarter to one-half mile.[92] The Neighbors' expert did not conduct any studies or offer any conclusions regarding an appropriate distance for the volume of Defendants' operations. And because the Neighbors' odor logs document odors on their property located from one-quarter mile to two miles away from the barns, the trial could not reasonably have concluded that it was appropriate to abate an unproven nuisance located even farther away. For example, given that the TCEQ requires consideration of the prevailing wind direction as part of obtaining siting approval, the trial court should have considered the propriety of focusing any restrictions on relocating parts of the business to sites upwind of the Neighbors'

---

[91] Counsel for the Neighbors suggested that the trial court may have based its selection on evidence in the record that Sanderson had received a single complaint that the chicken farms could be smelled at a nearby baseball field, which was four miles away. Such anecdotal evidence is hardly on par with the Neighbors' odor logs, which Dr. Heber cross-referenced against available wind data.

[92] 31 TEX. ADMIN. CODE § 523.3(j)(3)(A).

homes. *Cf. Holubec II*, 214 S.W.3d at 658 ("[U]nder the permanent injunction entered by the trial court, the Holubecs are enjoined from relocating their feedlot to the northwest corner location that the parties do not dispute would not constitute a nuisance.").

Given the lack of evidence to support discounting the ability of these and any other available methods to constrain the odors from Defendants' activities below nuisance levels, the trial court had no basis to determine that a full shut-down was the sole means of fully abating the Neighbors' nuisance-level injury.

### C. Failing to account for defendant-specific equities in curtailing joint operations

Finally, because each Defendant has a different function in the operation and the record shows differences in the equities among them, the trial court—after setting the overall scope of the injunction according to the principles discussed above—should have considered how best to implement the necessary restrictions on a defendant-specific basis. In particular, the court failed to weigh the hardship imposed on each of the Defendants by stripping them of their chosen means of using their property to earn a livelihood.

As to all Defendants collectively, there is ample evidence to support the trial court's finding that—despite the voluminous and well-documented history of complaints and the TCEQ's verification of nuisance odors from the farms on multiple occasions—"Defendants deny that a nuisance exists and have either taken no or insufficient measures to reduce the odor pollution." Indeed, Defendants' strategy of non-compliance also extended to continuing their two-farm

misrepresentation as part of a frivolous challenge to one of their NOVs, thereby stopping TCEQ enforcement and extending the time period in which the TCEQ was precluded from issuing additional NOVs based on its new findings of nuisance odors on subsequent occasions. *Cf. Houston Fed'n of Tchrs., Loc. 2415*, 730 S.W.2d at 646 ("[I]f the agency is unable to provide relief, the courts may properly exercise their jurisdiction in order to provide an adequate remedy [by injunction]."). The trial court also observed that Defendants "admit that if an injunction does not issue, they will continue to conduct their Activities in the future in exactly the same way they have done in the past," demonstrating their deliberate indifference to the unlawfulness or the external effects of their operations.[93]

Nonetheless, the trial court has an obligation to resolve pertinent evidentiary disputes in balancing the equities relating to the injunction's scope. This obligation includes assessing the hardship each Defendant would suffer from various kinds of reductions in operations.

Here, TCEQ representatives not only testified that Defendants' Strategic Odor Control Plans were insufficiently detailed, they also cast doubt on whether the Huynhs and their employees were actually implementing the practices the Plans did describe. In addition, the record includes evidence about Sanderson's contracts with other growers in the area, which undermines the trial court's assumption that

---

[93] *Cf. Hall*, 2011 WL 61631, at *3 (looking to whether the "evidence shows that the author of the nuisance will not cease the nuisance without a court order"); *see also Reeves*, 2013 WL 4680529, at *5 (upholding permanent injunction where nuisance-maker "contended that he would consider ceasing his use of the propane cannon if a magistrate threatened to prosecute him").

Sanderson could not find another party to operate the sixteen barns on the Malakoff property without the Huynhs' involvement and without creating a nuisance.

More broadly, we note that the permanent injunction generally treats Defendants as interchangeable entities in a single enterprise. The record certainly includes support for the trial court's observation that the Huynhs offered "conflicting, inconsistent and 'concerning' testimony" on a variety of matters, including "who runs the farms, who signed certain governmental documents, . . . who receives the government subsidies, . . . who was answerable to Defendant Sanderson in the operation of the barns, what steps should be taken to abate odors, the cleaning and replacement of chicken litter, etc." Although such confusion is a problem of Defendants' own creation, the trial court should consider on remand the extent to which it is possible to disaggregate the conduct of individual Defendants or any equitable considerations appliable to a particular person, entity, or conduct.

For example, although the bulk of the financial hardship Defendants have identified—the remaining unpaid loans for constructing the permanent structures—will fall on Yvonne and Steve Huynh, their conduct also appears to be the most egregious, including: their receipt of hundreds of thousands of dollars of federal subsidies under false pretenses,[94] Steve's signing of his adult son Timmy's name on contracts with Sanderson and documents submitted to the TCEQ,

---

[94] Receiving funding for nuisance-generating conduct is relevant in measuring the relative financial hardship among the Defendants and between certain Defendants and the Neighbors.

and his efforts to dispute the common ownership and operation of the two farms to obstruct the TCEQ's enforcement efforts. In comparison, Thinh—unlike Timmy—has actually been providing labor to both farms, and he has received, reported, and paid taxes on regular cash distributions from the farms' operations.

Thus, after the trial court determines on remand the limits on Defendants' operations that are necessary to abate the nuisance-level odors on the Neighbors' properties, it should consider in exercising its equitable discretion whether such limits should be imposed equally on Defendants as a whole or distributed according to a defendant-specific balancing of the equities. For example, if the trial court determines that some barns must cease operations to bring the resulting odors below nuisance levels, the trial court should consider whether the equities weigh in favor of shutting down one of the two farms or limiting each farm to four barns. To the extent feasible, we urge the trial court to conduct a defendant-specific balancing of the equities to help inform the appropriate form and degree of corrective measures.

*    *    *

For these reasons, we conclude that paragraphs 1, 2, and 5 of the injunction must be reversed and the case remanded for further equitable proceedings before the trial court regarding abatement of the nuisance odor produced by Defendants' chicken-growing activities, including the receipt of additional evidence relevant for that purpose. This remand will allow the parties to address the proper scope of an injunction and the trial court to exercise its discretion to tailor these portions of the

injunction (and their associated definitions) consistent with this opinion.[95]

We note that the trial court showed admirable diligence in presiding over a lengthy trial involving complex issues of environmental science and property rights. We are confident that the jury's verdict and the court's detailed findings and conclusions provide a firm foundation for tailoring the scope of injunctive relief as we have described.

## CONCLUSION

In sum, we reject Defendants' challenges to whether the Neighbors established the prerequisites for an injunction and affirm the portion of the judgment concluding that the Neighbors are entitled to permanent injunctive relief. But because the trial court's injunction is overly broad in part, we reverse the portion of the court of appeals' judgment affirming paragraphs 1, 2, and 5 of the trial court's permanent injunction, and we remand for the trial court to modify the scope of this injunctive relief (and associated definitions) consistent with this opinion.

J. Brett Busby
Justice

**OPINION DELIVERED:** June 7, 2024

---

[95] Nothing in this opinion forecloses any further proceedings the trial court concludes are necessary to complete its task.